**Harvey PULLEN and United Fishermen of Alaska, Inc., Appellants,**

**v.**

**Fran ULMER, Lieutenant Governor of the State of Alaska, Fairness in Salmon Harvest, Inc., Appellees.**

No. S–7642.

Supreme Court of Alaska.

Aug. 26, 1996.

Arthur S. Robinson, Robinson, Beiswenger & Ehrhardt, Soldotna, for Appellants.

Avrum M. Gross and Susan A. Burke, Gross & Burke, Juneau, for Appellee Fairness in Salmon Harvest, Inc.

Sarah J. Felix, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee Fran Ulmer.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

*OPINION*

RABINOWITZ, Justice.

## I.   *INTRODUCTION*

Pullen and United Fishermen of Alaska, Inc. challenge an initiative designed to set priorities among different salmon harvest users.

## II.   *FACTS AND PROCEEDINGS*

In August of 1995, Appellee Fairness in Salmon Harvest, Inc. (F.I.S.H.) submitted an initiative application to the state.[1] The proposed initiative provided that subsistence, personal use, and sport fisheries would receive a preference to take a portion of the salmon harvest before the remaining harvestable salmon are allocated to other harvest users. The proposed initiative also sets a

---

1.  Pullen notes that "[t]he application was filed by Alaskans who believed that the Alaska Board of Fisheries was, in some circumstances, allocating

limit on the amount to be allocated to personal use and sport fisheries of five percent of the total projected statewide salmon harvest, though this limit may be exceeded for any particular species or region.

The F.I.S.H. initiative, entitled "An Act Relating to the Management of Salmon" reads in full:

BE IT ENACTED BY THE PEOPLE OF THE STATE OF ALASKA

"An Act relating to the management of salmon"

Sec. 1.   PURPOSE (a) This act provides that, after maintenance of salmon stocks at sustained yield levels is assured, subsistence, personal use, and sport fisheries shall receive a preference to take a portion of the harvestable surplus of salmon stocks.   Subsistence, personal use, and sport fisheries must be ensured of a reasonable opportunity to take enough salmon necessary to satisfy the harvest needs of those fisheries before other fisheries may be allocated the remaining portion of the harvestable surplus.

(b) This Act does not alter existing or establish new allocations or preferences among subsistence, personal use, and sport fisheries.

(c) This Act does not give additional authority to the Board of Fisheries or the Department of Fish and Game, but relies upon the existence of their respective authorities to implement this Act.

Sec. 2.   AS 16.05 is amended by adding a new section to article 5 to read:

Sec.   16.05.735   MANAGEMENT   OF ALASKA SALMON STOCKS. (a) After providing for biological escapement needs of Alaska salmon stocks, the Board of Fisheries and the department shall exercise their respective authorities under this title to reserve a priority for the harvest needs of common consumptive uses for each salmon stock, to the extent that is technically possible, prior to allocating a portion of the harvestable surplus to nonpriority uses along the entire migratory

an unreasonable portion of salmon to commercial fisheries at the expense of personal consumptive uses."

path of a stock. The total number of salmon, without regard to the species of salmon, reserved to satisfy the harvest needs of personal use and sport fisheries may not exceed five percent of the total projected statewide harvest of all species of salmon. Personal use and sport fisheries may harvest in excess of five percent of a .particular species or stock and or in excess of five percent of the total harvest in a given geographic region of the state. However, the harvest priority for personal use and sport fisheries may not exceed five percent of the total projected statewide harvest.

(b) All harvests shall be made in a habitat responsible manner. The Board shall adopt regulations establishing methods and means of taking salmon that protects salmon spawning and rearing habitat from damage that will, individually or cumulatively, result in significant reduction in the productivity of salmon stocks.

(c) In this section,

(1) "common consumptive use" means the use of salmon harvested under subsistence, personal use, or sport fishing regulations or statutes;

(2) "harvest needs" means the harvest capability, using bag limits as established by the Board and the department of all common consumptive uses based upon projected participation, and assuming a harvestable surplus of salmon exists after ensuring an adequate biological escapement;

(3) "salmon" means Coho, Chinook, Sockeye, Pink, and Chum salmon that originate in or will return to spawn in Alaskan waters; salmon does not include Steelhead or other anadromous fish;

(4) "stock" means a population or aggregation of a particular species that typically possess common characteristics such as area of origin, migration patterns, run timing, habitat, and share in a common gene pool;

(5) "statewide salmon harvest" means the total projected annual harvest, in numbers of fish caught, of all combined species of salmon.

Lieutenant Governor Fran Ulmer certified the proposed initiative.[2] The initiative sponsors then circulated the petition among voters and obtained enough signatures to place the proposed initiative on the 1996 general election ballot.[3] Thereafter, the Division of Elections verified that the petition had the required number of signatures, and directed that the Department of Law prepare the ballot accordingly.

On November 7, 1995, appellants Harvey Pullen and United Fishermen of Alaska (Pullen) filed suit for declaratory and injunctive relief challenging, on several grounds, the Lieutenant Governor's certification of the initiative. More particularly, Pullen asserted that (1) the proposed bill is not a proper subject of an initiative because it would make an appropriation of the State of Alaska's salmon resources, (2) the allocation of salmon resources of the state among common users is exclusively the responsibility of the legislature, (3) the Lieutenant Governor's impartial summary explaining the proposed bill is misleading as to its terms and effects, and (4) the proposed classification of common users of the state's salmon resource is underinclusive and unfair because the initiative denies commercial fishers equal treatment and protection, a violation of the Uniform Applica-

---

**2.** The Lieutenant Governor is charged with reviewing initiative applications for compliance with AS 15.45.010–.080. Upon request from the Lieutenant Governor, the Attorney General's Office reviewed the proposed initiative as to whether it was in proper form under applicable state constitutional provisions and statutes. The Attorney General's Office concluded that it was a close question as to whether the proposed initiative is in proper form, but recommended that it be certified even though there is some doubt as to its validity.

A determination by the Lieutenant Governor that a proposed initiative is in the proper form

includes a determination that it does not cover a subject that is restricted for enactment by the Alaska Constitution. AS 15.45.010–080. *See also Boucher v. Engstrom*, 528 P.2d 456, 460–61 (Alaska 1974) (overruled on other grounds, *McAlpine v. University of Alaska*, 762 P.2d 81, 84 (Alaska 1988)). This determination is put in issue by Pullen's appeal.

**3.** In accordance with AS 15.45.090(2), the Lieutenant Governor prepared a petition containing the proposed bill as well as a summary of the proposed initiative.

tion clause in article VIII, section 17 of the Alaska Constitution.[4] By way of relief, Pullen sought a declaration of unconstitutionality and an injunction prohibiting the Lieutenant Governor from placing the initiative on the November 1996 general election ballot.

Thereafter, Pullen moved for summary judgment, with all parties agreeing that no genuine issues of material fact existed. Pullen grounded his summary judgment motion on the contention that the proposed initiative is not a proper subject for an initiative and is in violation of articles VIII, XI, and XII of the Alaska Constitution as well as AS 15.45.010.

In opposition, the Lieutenant Governor argued that the proposed bill is a proper subject for an initiative because it merely creates a new priority system for the allocation of salmon resources among groups of fishers, that the allocation of salmon is not within the exclusive law-making power of the legislature, and that it does not make an appropria-

tion by the state. F.I.S.H. in turn contended that salmon in their natural state are not property subject to appropriation. F.I.S.H. further argued, in the alternative, that if salmon are considered state property subject to appropriation, the initiative does not make an appropriation of salmon.

The superior court denied Pullen's motion for summary judgment, and entered final judgment, for Lieutenant Governor Ulmer and F.I.S.H. In granting summary judgment, the superior court ruled that salmon are public assets of the state which may not be appropriated by initiative;[5] that neither the Alaska Constitutional Convention Minutes nor article XII, section 11 of the Alaska Constitution support Pullen's assertion that the Public Trust doctrine prohibits establishing a new priority of the state's natural resources directly through the initiative process;[6] and that the initiative does not make an appropriation of state assets.[7]

---

**4.** Grounds numbered three and four are not at issue in this appeal.

**5.** In its Memorandum and Order, the superior court stated:

> The court believes that while the state does not literally own salmon resources, salmon are public assets which may not be appropriated by initiative. The Alaska Constitution contains explicit provisions which state that the natural resources of the state belong to the state, which controls them as trustee for the people of the state. The state takes in significant revenues from fish taxes. The right to participate in the statewide harvest of salmon is valuable to all user groups. Fish have long been an important part of the economy and the desire to control fish resources was an important motivation for Statehood. Permits granted by the state to take fish sell for significant sums. The state devotes substantial financial resources for the protection and management of fish and other wildlife. These factors taken together provide a basis for concluding that the state has sufficient interest in salmon as public assets so as to characterize them as state property which may not be appropriated by initiative.
>
> (Footnote omitted.)

**6.** In regard to this holding the superior court stated:

> The court believes that neither the Alaska Constitutional Convention Minutes nor Article XII, section 11 of the Alaska Constitution support the plaintiffs' assertion that the public trust doctrine prohibits establishing a new pri-

ority of the state's natural resources directly through the initiative process. The delegates to the constitutional convention after considerable debate regarding the impact of the authority of Alaskans to enact legislation directly through initiative, decided not to distinguish between matters in the hands of the legislature and matters subject to the initiative process. The court finds nothing in Article XI, Article XII, or the Minutes of the Alaska Constitutional Convention which (aside from an appropriation argument) would prohibit the subject matter of the F.I.S.H. Initiative from being enacted by the people of Alaska directly through the initiative process.

> The plaintiffs' public trust doctrine argument may pose a separate, post ballot-box issue. At the current stage of the enactment process, the only issue for the court is whether by creating a new priority among beneficial users of the state's fishery resources, the F.I.S.H. Initiative makes an appropriation under the *McAlpine* test.

**7.** As to this last holding, the superior court in its Memorandum and Order wrote:

> The court finds that the F.I.S.H. initiative does not constitute an appropriation as defined by the Alaska Supreme Court in *McAlpine*. The substantive portion of the F.I.S.H. Initiative creates a new system of preference among beneficial users of the statewide salmon harvest. The F.I.S.H. initiative requires that after escapement decisions are made, the Board of Fisheries must then determine what percentage, if any, will be allocated to personal use

## III. STANDARD OF REVIEW

The parties agree that there are no genuine issues of material fact in dispute. The appeal primarily concerns only questions of the constitutionality of the proposed initiative. These are questions of law. In regard to questions of law, we apply our independent judgment. *Croft v. Pan Alaska Trucking, Inc.,* 820 P.2d 1064, 1066 (Alaska 1991). Regarding questions of law, this court adopts the rule of law that is most persuasive in light of precedent, reason and policy. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

Concerning the applicable standard of review in matters involving initiatives, we have said that the usual rule is "to construe voter initiatives broadly so as to preserve them whenever possible. However, initiatives touching upon the allocation of public revenues and assets require careful consideration because the constitutional right of direct legislation is limited by the Alaska Constitution." *Fairbanks v. Convention & Visitors Bureau,* 818 P.2d 1153, 1155 (Alaska 1991) (citation omitted).

## IV. DISCUSSION

Pullen's appeal from the superior court's decision on summary judgment raises two issues. First, Pullen argues that management of Alaska's salmon resources falls exclusively within the power of the state legislature as trustee of Alaska's wildlife, and therefore is not a proper subject of an initiative. Second, Pullen contends that the pro-

posed initiative makes an appropriation of state property, in violation of article XI, section 7 of the Alaska Constitution. We address this latter contention first.

### A. The Initiative as an Appropriation

1. *Can wildlife be characterized as state property subject to appropriation?*

Article XI, section 7 of the Alaska Constitution provides in part that "[t]he initiative shall not be used to ... make or repeal appropriations...." In *Thomas v. Rosen,* 569 P.2d 793, 796 (Alaska 1977), we endorsed the following definition of "appropriations":

> the setting aside from the public revenue of a certain sum of money for specific objects in such a manner that the executive officers of the government are authorized to use that money, and no more for that object, and no other.

Two subsequent decisions of this court have held that the term "appropriations" as used in article XI, section 7 embraces not only appropriations of money but initiatives that propose to "give away" any public asset, including land. In *Thomas v. Bailey,* 595 P.2d 1 (Alaska 1979), we held that an appropriation of state land to the general public was just as much an appropriation as a disposition of money from the treasury. Specifically, we said, "The stated purpose and effect of the Initiative on the state treasury is still an expenditure of state assets in the form of public lands." *Id.* at 9. Subsequently, in regard to an initiative that would have re-

and sport fisheries up to a maximum of five percent. The initiative does not alter or establish new allocations or preferences among subsistence, personal use, and sport fisheries. By itself, the initiative does not convey or allocate any part or definite amount of the salmon harvest to a specific user group. Further action by the Board of Fisheries is required before fish resources are allocated to competing user groups.

The Board has broad discretion under the initiative to make allocations to consumptive and non-consumptive users based on the amount of fish available and escapement needs. There are no definite or calculable amounts to which any user group is automatically entitled. The directive that up to five percent of the statewide harvest must be reserved for consumptive users provides a maximum "preference" that is within the Board's

discretion to implement. The initiative does not guarantee that personal use and sport fisheries will be allocated any fish. Despite the preference scheme, the Board has considerable discretion to determine the amount of fish each group is entitled to and may still allocate based on what it sees as the best interests of the whole.

This pre-election review of an initiative is limited to a determination of whether the contents of the initiative include subjects which the people may not enact directly through initiative. The F.I.S.H. Initiative establishes a preference, but retains allocation decisions in the Board of Fisheries. As such, the initiative is not executable, mandatory, or reasonably definite without further legislative action. The initiative does not make an appropriation of state assets as defined by the Alaska Supreme Court in *McAlpine.*

quired the Municipality of Anchorage to sell a utility to a private non-profit organization for one dollar, we said:

> We noted [in *Thomas v. Bailey* ] that the constitutional convention delegates "wanted to prohibit the initiative process from being used to enact give-away programs, which would have inherent popular appeal, that would endanger the state treasury."
> ... We conclude that the logic of *Bailey* also applies in the instant appeal. The prohibition against appropriation by initiative applies to *all* state and municipal assets.

*Alaska Conservative Political Action Committee v. Municipality of Anchorage*, 745 P.2d 936, 938 (Alaska 1987) (citation and footnote omitted).

It is against this decisional background that F.I.S.H. argues that wildlife is not truly an asset of the state. F.I.S.H. argues that state ownership of wildlife is merely a legal fiction, and should not be applied in the context of deciding whether wildlife is an asset of the state which is subject to appropriation. F.I.S.H. cites several United States Supreme Court cases in support of its position that a state does not literally own the wildlife found within its borders.[8] More particularly, F.I.S.H. concludes that "[a]s a matter of simple common sense, it should be obvious that whatever the Constitution says about fish and game 'belonging to the state,' salmon or moose or other wild creatures are not state assets in the same way that money or buildings are assets." (Footnote omitted.)

We agree that this facet of F.I.S.H.'s argument is well established—the state does not own wildlife in precisely the same way that it owns ordinary property. However, this does not answer the question of whether the state's interest in wildlife is such that it can be appropriately characterized as state property subject to appropriation.

F.I.S.H. asks, "If the moose population plunges due to a sudden increase in the wolf population, does the state have an obligation to notify Moody's so that its bond rating may be adjusted?" F.I.S.H. assumes that the answer is "No," reasoning that these kinds of harms cannot affect the financial health of the state. We think this assumed answer is wrong.

In fact, a precipitous decline in the moose population may not, on its own, be enough to greatly affect the state's bond rating, but the effect on the state would be as significant as the loss of any other asset. Moose are valuable assets to Alaska, helping in attracting tourists, for example. Furthermore, if other wildlife populations also plummeted, the state's finances would obviously be affected as one of the primary tourism attractors disappeared. Finally, if the state's salmon population precipitously declines, the fishing industry would be devastated, causing even more harm to Alaska's economy and revenue base. The state benefits from the harvest of salmon through the collection of taxes imposed on business enterprises engaged in the fishery and license fees imposed on sport, personal use, and commercial fisheries.

Insofar as loss, use, or exploitation of wildlife directly affects Alaska's fish, it is a state "asset." The fact that other aspects of ownership may not be present in the state's legal relationship to its wildlife does not change this conclusion. We reach this holding for the following additional reasons.

First, examination of the relevant provisions of the Natural Resources Article of the Alaska Constitution clearly indicates the importance of the state's interest in fish.

---

**8.** According to F.I.S.H., "[t]he United States Supreme Court itself has been careful in its decisions since [*Geer v. Connecticut*, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896)] to clarify the fact that state 'ownership' of fish and game is simply a shorthand way of describing the state's significant interest in preserving and regulating fish and wildlife within its borders." In addition to *Geer*, F.I.S.H. cited *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (overruling *Geer*); *Baldwin v. Montana Fish and Game Comm'n*, 436 U.S. 371, 384–86, 98 S.Ct. 1852, 1860–62, 56 L.Ed.2d 354 (1978); *Toomer v. Witsell*, 334 U.S. 385, 402, 68 S.Ct. 1156, 1165, 92 L.Ed. 1460 (1948); and *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 284, 97 S.Ct. 1740, 1751–52, 52 L.Ed.2d 304 (1977) ("The 'ownership' language of cases such as those cited by appellant must be understood as no more than a 19th century legal fiction expressing 'the importance ... that a state have power to preserve and regulate the exploitation of an important resource.' ").

Article VIII, section 2 of the Alaska Constitution provides:

*General Authority.* The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for maximum benefit of its people.

Article VIII, section 3 provides:

*Common Use.* Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.

Article VIII, section 4 provides:

*Sustained Yield.* Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses.

In *Owsichek v. State, Guide Licensing,* 763 P.2d 488 (Alaska 1988), we had occasion to analyze the common use clause found in article VIII, section 3 of Alaska's Constitution. After noting that the framers of our constitution apparently intended to constitutionalize historic common law principles governing the sovereign's authority over management of fish, wildlife, and water resources, we said:

Thus, common law principles incorporated in the common use clause impose upon the state a trust duty to manage the fish, wildlife and water resources of the state for the benefit of all the people. We have twice recognized this duty in our prior decisions. In *Metlakatla Indian Community, Annette Island Reserve v. Egan,* 362 P.2d 901, 915 (Alaska 1961) *aff'd* 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962), we stated:

These migrating schools of fish, while in inland waters, are the property of the state, *held in trust for the benefit of all the people of the state,* and the obligation and authority to equitably and wisely regulate the harvest is that of the state.

(Emphasis added.) Similarly, in *Herscher v. State, Department of Commerce,* 568 P.2d 996, 1003 (Alaska 1977), we noted that the state acts "as trustee of the natural resources for the benefit of its citizens." *Id.* at 495.

In a footnote to this text, we stated:

The Court overruled *Geer*'s state ownership doctrine in *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). That case involved facts almost identical to *Geer:* the Oklahoma statute at issue forbade the export of minnows taken from the waters of the state. *See id.* at 323, 99 S.Ct. at 1729, 60 L.Ed.2d at 254. The Court struck down the statute as violative of the commerce clause. *Id.* at 338, 99 S.Ct. at 1737, 60 L.Ed.2d at 263. The Court found the state ownership doctrine to be a legal fiction that created anomalies and did not conform to "practical realities." *Id.* at 335, 99 S.Ct. at 1735, 60 L.Ed.2d at 261. Nothing in the opinion, however, indicated any retreat from the state's public trust duty discussed in *Geer.* Indeed, the Court stated, "[T]he general rule we adopt in this case makes ample allowance for preserving, in ways not inconsistent with the Commerce Clause, the legitimate state concerns for conservation and protection of wild animals underlying the 19th century legal fiction of state ownership." *Id.* at 335–36, 99 S.Ct. at 1735–36, 60 L.Ed.2d at 261.

. . . .

After *Hughes,* the statements in the Alaska Constitutional Convention regarding sovereign ownership, quoted *supra,* are technically incorrect. Nevertheless, the trust responsibility that accompanied state ownership remains.

*Id.* at 495 n. 12.

These important themes have been consistently reaffirmed. *See Gilbert v. State, Dep't of Fish and Game,* 803 P.2d 391, 399 (Alaska 1990); *Shepherd v. State, Dep't of Fish and Game,* 897 P.2d 33, 40 (Alaska 1995).

Given the above, we think there is merit in Pullen's contention that the public trust responsibilities imposed on the state by the provisions of article VIII of our constitution compel the conclusion that fish occurring in their natural state are property of the state for purposes of carrying out its trust respon-

sibilities. In short, we are in agreement with Pullen's position that

> [i]t is the authority to control naturally occurring fish which gives the state property-like interests in these resources. For that reason, naturally occurring salmon are, like other state natural resources, state assets belonging to the state which controls them for the benefit of all of its people.

We hold that the state's interest in salmon migrating in state and inland waters is sufficiently strong to warrant characterizing such salmon as assets of the state which may not be appropriated by initiative. Thus we conclude that the superior court correctly reasoned that salmon are public assets of the state which may not be appropriated by initiative.

### 2. Does the initiative constitute an appropriation?[9]

■ Article XI, section 7 of the Alaska Constitution states in part:

> The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts or prescribe their rules, or enact local or special legislation.[10]

On four previous occasions we have construed the appropriations limitation on the initiative power.

*Thomas v. Bailey*, 595 P.2d 1 (Alaska 1979), presented in the context of a land giveaway initiative, the issue of whether the prohibition on making appropriations included initiatives which required the outflow of land,

or was limited to the outflow of money. *Bailey* established that not only money, but also other state assets could be the subject of appropriations, and therefore that the initiative was prohibited. In reaching this holding we observed that "[t]hough most state constitutions with referendum and initiative provisions have some limitation relating to appropriation, Alaska's appropriation limitation is worded more generally than that of most other states." *Id.* at 4.[11] Of particular significance is the emphasis given in *Bailey* on the dangers associated with direct legislation relating to appropriations.

> The restrictions on permissible subjects for direct legislation represent "a recognition ... that certain particularly sensitive or sophisticated areas of legislation should not be exposed to emotional electoral dialogue and impulsive enactment by the general public." Stewart, *The Law of Initiative Referendum in Massachusetts*, 12 N. Engd. L.Rev. 455, 461 (1977) (footnote omitted). The danger with direct legislation relating to appropriations is that it "tempt[s] the voter to [prefer] ... his immediate financial welfare at the expense of vital government activities." Note, *Referendum: The Appropriations Exception in Nebraska*, 54 Neb. L.Rev. 393, 394 (1975). *Cf. Brown v. Ward*, 593 P.2d 247 (Alaska 1979). The lure of an immediate grant of land poses the same temptation as an immediate grant of money. Both decisions are the kind that require the reasoned deliberation characteristic of legislative actions.

9. As we explained above,
   [t]he usual rule applied by this court is to construe voter initiatives broadly so as to preserve them whenever possible. *Thomas v. Bailey*, 595 P.2d 1, 3 (Alaska 1979). However, initiatives touching upon the allocation of public revenues and assets require careful consideration because the constitutional right of direct legislation is limited by the Alaska Constitution.
   *Fairbanks v. Convention & Visitors Bureau*, 818 P.2d 1153, 1155 (Alaska 1991).

10. AS 15.45.010 provides:
    The law making powers assigned to the legislature may be exercised by the people through the initiative. However, an initiative may not

be proposed to dedicate revenue, to make or repeal appropriations, to create courts, to define the jurisdiction of courts or prescribe their rules, or to enact local or special legislation.

11. In this regard we further stated:
    Even if the initiative provision referred to appropriations "of public funds," the issue would still be whether public funds refers generally to the state's assets or only those assets in the form of money. We have concluded that by the term "appropriations," Article XI, section 7 prohibits an initiative whose primary objective is to require the outflow of state assets in the form of land as well as money.
    *Bailey*, 595 P.2d at 6, 7.

*Id.* at 8.[12]

The prohibition against using an initiative to make an appropriation next arose in *Alaska Conservative Political Action Committee v. Municipality of Anchorage,* 745 P.2d 936 (Alaska 1987). There we concluded that the logic of *Bailey* controlled and that "[t]he prohibition against appropriations by initiative applies to *all* state and municipal assets." *Id.* at 938. We further stated:

A utility with $32.7 million equity is a significant municipal asset. The initiative would require the Municipality to transfer it for the nominal sum of one dollar. This is precisely the kind of "rash, discriminatory, and irresponsible act[ ]" against which the state and its subdivisions are protected under Article XI, section 7.

*Id.*

The issue arose again in *McAlpine v. University of Alaska,* 762 P.2d 81 (Alaska 1988). In *McAlpine,* an initiative was proposed re-establishing the community college system in the state. This part of the initiative was not held to violate the prohibition on appropriations. However, the initiative also provided for the transfer of certain property of the University of Alaska to the Community College System:

The University of Alaska shall transfer to the Community College system of Alaska such real and personal property as is necessary to the independent operation and maintenance of the Community College System. The amount of property transferred shall be commensurate with that occupied and operated by the Community Colleges on November 1, 1989.

*Id.* at 83. Again drawing on *Bailey,* we said in *McAlpine:*

Parallel reasoning applies in the present case. Outside the context of give-away programs, the more typical appropriation involves committing certain public assets to a particular purpose. The reason for prohibiting appropriations by initiative is to ensure that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs. This rationale applies as much or nearly as much to allocations of physical property as to allocations of money. To whatever extent it is desirable for the legislature to have sole responsibility for allocating the use of state money, it is also desirable for the legislature to have the same responsibility for allocating property other than money. Otherwise, the prohibition against appropriations by initiative could be circumvented by initiatives changing the function of assets the State already owns. We conclude that the constitutional prohibition against appropriations by initiative applies to appropriations of state assets, regardless of whether the initiative would enact a giveaway program *or simply designate the use of the assets.*

*Id.* at 88, 89 (first emphasis in original, second emphasis added, footnote omitted). We

12. We further elaborated:

Initiatives for the purpose of requiring appropriations were thought to pose a special danger of "rash, discriminatory, and irresponsible acts." The delegates [to Alaska's Constitutional Convention] were influenced by the experience of other states whose constitutions placed no restrictions on the subject matter of initiatives. They adopted the appropriations restriction to avoid the bad experiences of those states.

The delegates wanted to prohibit the initiative process from being used to enact give-away programs, which have an inherent popular appeal, that would endanger the state treasury. A rather lengthy statement by Delegate Taylor explains the delegates' concerns:

Now in practically all the states that have initiative and referendum there are certain limitations put upon the matters that can be acted upon by those measures. Now appro-

priations are not subject to the initiative or the referendum. Some states made a great mistake by not restricting the initiative measures and allowed pressure groups to gather great numbers of signatures to a petition and that petition would require the expenditure of large amounts of money, perhaps a great deal more than the state could possibly afford and sometimes they would also initiate some legislation to raise money, a revenue measure and then directed that the proceeds of that measure would be utilized for a particular purpose. In other words, it took the making of revenue measures and expenditure of the funds away from the legislature and in some instances the governmental functions and governmental institutions suffered a great deal. And it was necessary within as short a time as possible to undo the damage that has been done.

*Id.* at 7, 8 (footnotes omitted).

then went on to hold that the second sentence of the initiative constituted an impermissible appropriation.

Most recently, we upheld a challenged initiative in *City of Fairbanks v. Fairbanks Convention & Visitors Bureau*, 818 P.2d 1153 (Alaska 1991). In that case, the initiative in question repealed a city code section which designated bed tax revenues for purposes of tourist and entertainment facilities and other economic development. The initiative also set aside the bed tax revenues for deposit in the city council discretionary fund. We held that the placing of revenues in the discretionary fund was not an appropriation. The test we applied was "whether the initiative would set aside a certain specified amount of money or property for a specific purpose or object in such a manner that it is executable, mandatory, and reasonably definite with no further legislative action." *Id.* at 1157.[13] In concluding that the initiative was not violative of the prohibition against making appropriations, we observed:

A reference to the dual purposes behind the prohibition of initiatives which make appropriations is instructive. First, the initiative is not a give-away program. No particular group or person or entity is targeted to receive state money or property, nor is there any indication that by passing this initiative, the voters would be voting themselves money. Second, this initiative does not reduce the council's control over the appropriations process. Instead, the initiative allows the council greater discretion in appropriating funds than does the current law. It is axiomatic that if FGCO 5.402 does not make an appropriation, then the initiative, which affords greater legislative discretion and is not a give-away program, cannot make an appropriation.

*Id.* at 1157.

From these decisions two core objectives of the constitutional prohibition on the use of initiatives to make appropriations can

be distilled. First, the prohibition was meant to prevent an electoral majority from bestowing state assets on itself. Second, the prohibition was designed to preserve to the legislature the power to make decisions concerning the allocation of state assets. In light of these objectives, we now address the question of whether the proposed initiative violates article XI, section 7 of the Alaska Constitution as well as AS 15.45.010. We answer this question in the affirmative.

Our interpretation of the proposed initiative leads us to the conclusion that the initiative, if enacted, would violate the basic purposes underlying Alaska's constitutional restriction against making appropriations by initiative. First, it is clear that the proposed initiative is designed to appeal to the self-interests of sport, personal and subsistence fishers, in that these groups are specifically targeted to receive state assets in the circumstance of harvestable shortages.[14] In short, it "tempt[s] the voter to [prefer] ... his immediate financial welfare at the expense of vital government activities." *Bailey*, 595 P.2d at 8. Second, the initiative significantly reduces the legislature's and Board of Fisheries' control of and discretion over allocation decisions, particularly in the event of stock-specific or region-specific shortages of salmon between the competing needs of users. *See McAlpine*, 762 P.2d at 88–89. ("The reason for prohibiting appropriations by initiative is to ensure that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs. This rationale applies as much or nearly as much to allocations of physical property as to allocations of money.")

The overriding purpose of the proposed initiative is to require the Board of Fisheries, after providing for the biological escapement needs of Alaska's salmon stocks, to reserve a priority for the harvest needs for each particular salmon stock of personal use, sport, and subsistence fisheries prior to allocating any portion of the harvestable surplus to com-

---

**13.** The test we applied in *City of Fairbanks* derives from *McAlpine*.

**14.** It should be noted that subsistence fisheries are already accorded a preference which is not

affected by our determination that the proposed initiative is violative of article XI, section 7 of the Alaska Constitution as well as AS 15.45.010.

mercial fisheries.[15] The State comes close to conceding that if the proposed initiative is approved by the electorate it could result in the closure of some commercial fisheries. In this regard, the State notes:

> Pink salmon, and to some respects sockeye salmon, are the largest producers in numbers of fish.... However, most of the sport fishermen in Southeast and the A–Y–K regions target kings and cohos.... *Since the priority is stock directed and allocation is not, one could argue that the initiative requires allocations of kings and cohos to sport and personal users in these regions. If so, this arguably requires closing some commercial fisheries also targeting kings and cohos.*[16]

(Emphasis added, citations omitted.)

We cannot interpret the proposed initiative as simply amending "a series of general legislative criteria to add more specific ones to guide the Board of Fisheries in its future allocation decisions" as F.I.S.H. contends. We think it is clear that the proposed initiative calls for an actual allocation, in the event of a shortage of a given salmon species in a given geographical region, to sport, personal use, and subsistence fisheries.[17] In such circumstances there exists the very real possi-

bility that the commercial fishers will be excluded from such fisheries. Thus, the initiative cannot be viewed as merely protecting the relative positions of sport, personal use, and subsistence fisheries as against commercial fisheries. Nor can this initiative be construed as not impinging upon the legislature's and Board of Fisheries' discretion to make allocation decisions among the competing needs of users. *See McAlpine,* 762 P.2d at 89, 91. The proposed initiative does not purport to maintain the existing relative positions between sport, personal use, and commercial fisheries. Further, the proposed initiative does remove the Board of Fisheries' discretion to make allocation decisions in times of shortages, and there is a very realistic danger that such shortages will occur.

For these reasons, we hold that the F.I.S.H. initiative violates article XI, section 7 of the Alaska Constitution, as well as AS 15.45.010.[18]

## V. CONCLUSION

The judgment of the superior court is REVERSED insofar as it holds that the proposed F.I.S.H. initiative does not make an appropriation of state assets in violation of the provisions of article XI, section 7 of the

---

**15.** We need not disavow the *McAlpine* "whether the initiative would set aside a certain specific amount of money or property for a specific purpose or object in such a manner that is executable, mandatory, and reasonably definitive with no further legislative action" language in concluding that the current initiative makes an appropriation. The initiative, if passed, would suffice without further action of the legislature to direct the Board of Fisheries to allocate salmon in accordance with its terms. Further, the point of the quoted language is that where the legislature retains a broad range of freedom to make allocation decisions, an appropriation will not be found. Under the current initiative, in cases of shortage—which is when the initiative operates—such freedom is not retained.

**16.** In regard to potential conflicts between different users, F.I.S.H. states:

> There are no conflicts at all over pink salmon, the most numerous of all salmon in Alaska. In most areas, chum salmon and red salmon are only exploited for commercial purposes. There are real conflicts on the Kenai Peninsula over king salmon and to a much lesser extent red salmon; there are conflicts in Southeastern Alaska over king and silver salmon, and

there are some conflicts between subsistence users and commercial fishermen on the river systems in western Alaska.

**17.** The Fish and Game statutes define "subsistence use" as the "noncommercial, customary and traditional uses of wild, renewable resources ... for direct personal or family consumption...." AS 16.05.940(32). "[P]ersonal use fishing means the taking, fishing for, or possession of fin fish ... by Alaska residents for personal use and not for sale or barter with gill or dip net, seine, fish wheel, long line, or other means defined by the Board of Fisheries." AS 16.05.940(24). "[S]port fishing means the taking of or attempting to take for personal use, and not for sale or barter, any ... anadromous fish by hook and line with the line attached to a pole or rod which is held in the hand or closely attended, or by other means defined by the Board of Fisheries." AS 16.05.940(29).

**18.** Our holding makes it unnecessary to address Pullen's argument that the management of Alaska's salmon resources falls exclusively within the power of the state legislature as trustee of Alaska's wildlife, and therefore is not a proper subject of an initiative.

Alaska Constitution. The case is REMAND-ED to the superior court with directions to amend its judgment to provide that the Lieutenant Governor is permanently enjoined from placing the proposed F.I.S.H. initiative on the 1996 general election ballot.

COMPTON, Chief Justice, concurring.

I concur with the court in holding that the judgment of the superior court should be amended to provide that the Lieutenant Governor be permanently enjoined from placing the F.I.S.H. initiative on the 1996 general election ballot. However, I do not agree that the initiative violates article XI, section 7 of the Alaska Constitution. Rather, I conclude that the initiative violates article XII, section 11 of the Alaska Constitution, and for this reason it cannot be placed on the ballot.

The court holds that "[i]nsofar as loss, use, or exploitation of wildlife directly affects Alaska's fish, it is a state 'asset.'" Op. at 59. The state's interest in migrating salmon is sufficiently strong "to warrant characterizing such salmon in their natural state as *assets of the state* which may not be appropriated by initiative." Op. at 61 (emphasis added). I cannot accept the conclusion that fish, or other wildlife, are "assets of the state."

It is correct to observe, as does the court, that wildlife is of significant value to the state. Unquestionably a "precipitous decline" in wildlife population would affect the state's finances for reasons identified by the court. Yet fish and wildlife occurring in their natural state are not remotely like the forests found on state owned lands, or hydrocarbons and minerals found on or under state owned lands. These are assets of the state in a sense of the term that readily can be understood. However, it is counter-intuitive to suggest that migratory wildlife is "an asset of the state." It is an asset *to* the State, not *of* the State.

In addition to the court's conclusion being counter-intuitive, there is virtually no case support for the proposition. The court quotes from *Owsichek v. State, Guide Licensing and Control Board,* 763 P.2d 488, 495 (Alaska 1988), which cited to and quoted from *Metlakatla Indian Community, An-nette Island Reserve v. Egan,* 362 P.2d 901 (Alaska 1961), *aff'd* 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962). In *Metlakatla,* the court stated that "[t]hese migrating schools of fish, while in inland waters, *are the property of the state,* held in trust for the benefit of all the state . . . ." *Id.* at 915 (emphasis added). The court notes candidly that the state ownership doctrine, given the blessing of the United States Supreme Court in *Geer v. Connecticut,* 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896), was overruled by the Court in *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). The Court termed the state ownership doctrine a legal fiction that did not conform to practical realities.

The court also correctly notes that *Hughes* did not dictate a retreat from the trust doctrine advanced in *Geer.* It is this trust relationship, repeatedly articulated and embraced by this court, that lies at the core of the present dispute. This relationship between migratory fish and game, the State of Alaska, and the people of the State of Alaska is not an "asset of the state" in any sense of the term.

The trust relationship derives generally from article VIII of the Alaska Constitution, and in this case specifically from article VIII, section 3, which provides that "[w]herever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use." This section, generally referred to as the "common use clause," can be amended by the people of the State, for that right is guaranteed them by article XIII, section 1 of the Alaska Constitution. However, it cannot be amended by the legislature, only implemented within the narrow confines of the limitations of the common use clause, which has created the trust relationship between the State and its people.

Article XII, section 11 of the Alaska Constitution provides in part that "[u]nless clearly inapplicable, the law-making powers assigned to the legislature may be exercised by the people through the initiative, subject to the limitations of Article XI." Since article VIII, section 2 of the Alaska Constitution grants the legislature law-making powers

over natural resources, the question becomes whether law-making powers through initiative are "clearly inapplicable" to implementation of the trust relationship established by article VIII, section 3. In my view, it is precisely because of the trust relationship that law-making powers through initiative are "clearly inapplicable."

Although the constitutional debate is not particularly informative, what does become clear from Delegate V. Fischer's and Delegate McLaughlin's remarks, *see* 4 *Proceedings of the Alaska Constitutional Convention*, at 2828 and 2847–51 (1955), is that "unless clearly inapplicable" does not mean "unless specifically excluded." The term "unless clearly inapplicable" became part of the constitution, the term "unless specifically excluded" did not. Undefined, "unless clearly inapplicable" thus becomes subject to interpretation.

In my view an initiated law is "clearly inapplicable" to the allocation of a resource reserved to the people for their common use. This is particularly so when the State holds the resource in trust for all the people of the State. The people, as beneficiaries of this trust, cannot dictate to the trustee the manner in which the trust is to be administered.

The uniqueness of this trust relationship in our government distinguishes it from most other relationships created by the Alaska Constitution. Additionally, the structure of the Department of Fish and Game belies the notion that fish and game management decisions may be left to initiated laws. The Commissioner of Fish and Game serves a specific term of five years, AS 16.05.010, unlike other commissioners. Also unlike other commissioners, who simply are appointed by the governor, subject to legislative approval, the Boards of Fisheries and Game present to the governor a list of qualified nominees for the office of Commissioner of Fish and Game. The governor makes the appointment from the list, or a supplemental list if he or she requests one. The appointment is subject to legislative approval. AS 44.39.030. Unlike other commissioners, specific professional qualifications for Commissioner of Fish and Game are required by statute, including "knowledge of the requirements for the protection, management, conservation, and restoration of the fish and game resources of the state." AS 16.05.010. Also unlike other commissioners, who serve at the pleasure of the governor, a proceeding for removal of the Commissioner must be initiated by a resolution by either the Board of Fisheries or Board of Game, who request the Commissioner's removal. Only then can the governor make a final decision to remove the Commissioner. AS 44.39.050.

The trust relationship, the structure of the Department of Fish and Game, the agency responsible for implementing the State's trust responsibilities for the benefit of all the people of the State, and the detailed professional requirements that must be possessed by the Commissioner of Fish and Game, the executive who directs that agency, persuasively demonstrate the clear inapplicability of initiated laws which dictate policies regarding the "protection, management, conservation, and restoration of the fish and game resources of the state."

Long ago we set upon a course that defined the State's responsibility under the common use clause as that of a trustee for its people, the beneficiaries of that trust. I am persuaded that the characterization of that relationship was, and is, correct. I am persuaded similarly that the constitutional grant of the right of initiative is clearly inapplicable to alter such a relationship.