ALASKA ACTION CENTER,
INC., Appellant,

v.

MUNICIPALITY OF ANCHORAGE,
Appellee.

No. S–11252.

Supreme Court of Alaska.

Feb. 6, 2004.

Valerie L. Brown, Trustees for Alaska, Anchorage, for Appellant.

Joseph D. O'Connell, Assistant Municipal Attorney, and Frederick H. Boness, Municipal Attorney, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

This expedited appeal concerns an initiative proposed by citizens of Girdwood, aimed at preserving much of the lower end of Girdwood valley as a park. The land is currently owned by the Municipality of Anchorage and has been subject to extensive study and planning, much of it aimed at the development of a private golf course. The Anchorage municipal clerk rejected the initiative petition on the advice of the municipal attorney, who maintained that it would constitute an impermissible appropriation. Alaska Action Center (AAC) appeals the clerk's decision, arguing that the clerk does not have the authority to reject the initiative petition on those grounds, and that in any event the decision to reject it was wrong because the initiative does not propose an appropriation. We affirm, holding that executive officers are empowered to review prospective initiatives to ensure that they comply with statutory and constitutional subject-matter restrictions and that the proposed Girdwood initiative was properly rejected because the designation of parkland would effect an appropriation. We further hold that the impermissible park designation should not be severed from the rest of the initiative because no other portion may be certified in its absence.

## II. FACTS AND PROCEEDINGS

The Municipality of Anchorage owns several hundred undeveloped acres in the lower end of Girdwood valley. Through several rounds of study and planning, the Municipality identified a golf course as a potential use for the land, and attempted to lease 730 acres of the land to a private developer in 1997. This lease was found unlawful on a number of grounds, including that it failed to conform with Anchorage code provisions requiring leases to reflect the land's market

value.[1] When the Municipality changed its ordinance to allow below-market leases, some Girdwood citizens launched a municipal initiative.

The proposed initiative would amend the Anchorage charter, adding Article XXII. Section 22.01 sets out a "Policy Statement," expressing that the "eastern lower Girdwood valley is largely unsuitable for development and is best preserved in its natural state." Section 22.02 dedicates as a park that specific land identified in Section 22.03 as the 730 acres subject to the flawed 1997 lease, "excluding such 61 acres located north of 60° 57′ 5″ North latitude that the Anchorage Planning and Zoning Commission and the Municipal Assembly may select for development for single-family dwellings and commercial development." Section 22.03 also sets minimum lot sizes for the residential development and requires that any sales or leases be for fair market value. Sections 22.04 and .05 limit development within the park to seven acres of campground and an educational or recreational center, the construction of hiking or cross-country skiing trails, and the maintenance of existing roads or rights-of-way. Section 22.06 bars any use of the park for a golf course or other golf-related uses. Finally, Section 22.07 is a severability clause.

The sponsors submitted their initiative petition to the municipal clerk for certification in accordance with Anchorage Municipal Code 2.05.050. The clerk refused to certify the petition, relying on an opinion letter from the municipal attorney, which advised that the petition was "legally insufficient" because it proposed an appropriation. AAC appealed the clerk's action to the superior court, where both AAC and the Municipality moved for summary judgment. The superior court granted judgment to the Municipality, and AAC appealed to this court.

## III. DISCUSSION

### A. Standard of Review

▪ This court reviews a grant of summary judgment de novo.[2] The questions we address in this case—the authority of executive officers, the meaning of the constitutional term "appropriation," and the severability of parts of the initiative—are all questions of law. To these we apply our independent judgment, "adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy."[3]

### B. A Municipal Clerk Has the Authority To Reject an Initiative on Subject–Matter Grounds.

▪ By statute, the power of lawmaking by initiative on the local level is reserved to the people of a home rule municipality.[4] Also by statute, this power may not be used to take any of the actions listed in article XI, section 7 of the Alaska Constitution.[5] Under article XI, section 7, an initiative may not be used to "make or repeal appropriations."[6] The clerk of the Municipality of Anchorage refused to certify the initiative petition on the advice of the municipal attorney, who asserted in a brief opinion that if passed, the initiative would effect an appropriation. AAC challenges the clerk's power to make this determination in the absence of clearly controlling precedent, claiming that allowing an officer of the executive branch to keep an initiative off the ballot violates separation of power principles. A review of our cases dealing with the timing of initiative challenges shows that the clerk did not exceed her authority.

1. *Turnagain Arm Conservation League v. Municipality of Anchorage*, No. 3AN–99–04120 (Alaska Super., February 6, 2001) (order granting summary judgment).

2. *Alakayak v. British Columbia Packers, Ltd.*, 48 P.3d 432, 447 (Alaska 2002).

3. *Pullen v. Ulmer*, 923 P.2d 54, 58 (Alaska 1996).

4. AS 29.26.100 ("The powers of initiative and referendum are reserved to the residents of mu-

nicipalities ...."); *see also* AS 29.10.030(a) ("A home rule charter shall provide procedures for initiative and referendum.").

5. *See* AS 29.26.100 ("The powers of initiative and referendum ... do not extend to matters restricted by art. XI, Sec. 7 of the state constitution."); AS 29.10.030(c) ("A charter may not permit the initiative and referendum to be used for a purpose prohibited by art. XI, Sec. 7 of the state constitution.").

6. Alaska Const. art. XI, § 7.

The constitutionality of an initiative may be reviewed either before it goes to the voters or after it is enacted. We have divided challenges into two categories to determine when review is proper. One type of challenge invokes "the particular constitutional and statutory provisions regulating initiatives."[7] The executive officer in charge of certifying initiatives—in this case, the municipal clerk—has discretion to reject the measure if she determines it "violates any of the[se] liberally construed restrictions on initiatives,"[8] and the courts may review the clerk's decision right away.[9] Separation of powers principles are not offended by this procedure, as these restrictions were devised to prevent certain questions from going before the electorate at all;[10] an executive officer must play the gatekeeper role in the first instance. Other challenges are grounded in "general contentions that the provisions of an initiative are unconstitutional."[11] The executive officer may only reject the measure if "controlling authority" leaves no room for argument about its unconstitutionality.[12] The initiative's substance must be on the order of a proposal that would "mandat[e] local school segregation based on race" in violation of *Brown v. Board of Education* before the clerk may reject it on constitutional grounds.[13] And absent controlling authority, the court should not decide this type of challenge until the initiative has been enacted by the voters.[14]

The distinction between these two classes of initiative challenges is well illustrated by a comparison of the challenge we declined to address in *Kodiak Island Borough v. Maho-ney* with the one we reviewed in *Brooks v. Wright*. In *Mahoney*, the Kodiak municipal clerk rejected a proposed initiative that would have imposed term limits on the borough mayor, on the ground that such term limits would violate the Alaska Constitution.[15] We held that the clerk's decision was inappropriate in the absence of clearly controlling authority, and we did not reach the merits of the constitutionality of the term limits proposal.[16] In *Brooks*, a group of citizens challenged a proposed initiative that would ban the use of snare traps on wolves; the suit was brought before the ballot measure went before the electorate.[17] The challengers claimed that under article XII, section 11 of the Alaska Constitution, which allows "the law-making powers assigned to the legislature" to be exercised through the initiative process except when the initiative is "clearly inapplicable," the snare trap ban could not be enacted by ballot measure.[18] We addressed the merits of their complaint, finding that the measure could go to the voters.

The crucial difference between these two claims is in what they say is wrong with the initiative. In *Mahoney*, the clerk was assessing the substance of the proposed ordinance to determine whether it was unconstitutional. The validity of a term limits statute would not depend on whether it was enacted by initiative or by the legislature. It was the clerk's contention that the underlying provisions of the initiative were unconstitutional, but this question could be decided only after enactment and was therefore beyond the clerk's authority to review. On the other

7. *Brooks v. Wright*, 971 P.2d 1025, 1027 (Alaska 1999) (citation omitted).

8. *Kodiak Island Borough v. Mahoney*, 71 P.3d 896, 900 (Alaska 2003); *see also Boucher v. Engstrom*, 528 P.2d 456, 460–61 (Alaska 1974) (holding that lieutenant governor's review of initiative's "form" properly includes determination that it conforms with constitutional subject-matter restrictions), *overruled in part on other grounds by McAlpine v. University of Alaska*, 762 P.2d 81 (Alaska 1988).

9. *Brooks*, 971 P.2d at 1027.

10. *See Boucher*, 528 P.2d at 460.

11. *Brooks*, 971 P.2d at 1027 (citation omitted).

12. *Mahoney*, 71 P.3d at 900.

13. *Id.* at 900 n. 22 (citing *Brown v. Board of Educ. Of Topeka, Kan.*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)).

14. *Brooks*, 971 P.2d at 1027.

15. 71 P.3d at 897.

16. *Id.* at 900–01.

17. 971 P.2d at 1026–27.

18. *Id.* at 1027–28.

hand, the challenge that we considered in *Brooks* was the initiative opponents' claim that the people's law-making authority through the initiative process did not include the power to ban snare traps. Thus, the argument before us in *Brooks* went directly to the use of the initiative process itself to ban snare traps rather than to the propriety of the ban itself, even if passed by the legislature. As a challenge only to the use of the initiative process to enact the statute, not its substance, the *Brooks* appellees' claim was based on the constitutional restrictions on initiatives. This challenge could be reviewed—both by the executive branch and by the courts—before the election.

██ This review of our case law shows that subject-matter limitations on initiatives—that is, provisions that set out topics that may not be legislated by the ballot process—are among the grounds for pre-election review.[19] The proscriptions of AS 29.26.100 and article XI, section 7 of the Alaska Constitution are such subject-matter restrictions. The Anchorage clerk was thus acting within her authority when she rejected the initiative on the ground that it would make an appropriation.

19. *See id.* ("[O]ur [pre-election] review of the initiative ... is limited to whether the *subject matter* is constitutionally permissible.") (emphasis added); *Alaska Conservative Political Action Comm. v. Municipality of Anchorage,* 745 P.2d 936, 937 (Alaska 1987); *Boucher,* 528 P.2d at 460–61; *Walters v. Cease,* 394 P.2d 670 (Alaska 1964), *disapproved on other grounds by Boucher; see also Starr v. Hagglund,* 374 P.2d 316 (Alaska 1962).

20. *City of Fairbanks v. Fairbanks Convention & Visitors Bureau,* 818 P.2d 1153, 1157 (Alaska 1991). In other constitutional contexts, "appropriation" may have a different definition. For example, construing the initiative provisions of the constitution and construing the provisions delineating the governor's veto power "require different interpretations of 'appropriations' because they serve vastly different purposes." *Alaska Legislative Council ex rel. Alaska State Legislature v. Knowles,* —— P.3d ——, ——, 2004 WL 42610, at *2 (Alaska, January 9, 2004); *see also City of Fairbanks,* 818 P.2d at 1156–57 (reading "appropriation" more narrowly when considering whether measure repeals appropriation than when considering whether measure makes appropriation).

## C. The Girdwood Initiative Proposes To Make an Appropriation.

██ The Anchorage clerk and the superior court determined that the Girdwood initiative would effect an appropriation and therefore was a barred use of the initiative power under AS 29.26.100 and article XI, section 7 of the Alaska Constitution. An initiative proposes to make an appropriation if it "would set aside a certain specified amount of money or property for a specific purpose or object in such a manner that it is executable, mandatory, and reasonably definite with no further legislative action."[20] Although appropriation is often understood to refer to money, an initiative setting aside land, or any other type of government property, may also be an appropriation.[21] The same definition applies whether the initiative is municipal or statewide.[22]

██ Our decisions reflect "two core objectives" of the limitation on using initiatives to make appropriations.[23] First, the provision "prevents an electoral majority from bestowing state assets on itself."[24] This concern comes into play when the initiative would enact a give-away, forcing the state or a municipality to transfer assets into private hands, as with the land give-away in *Thomas*

21. *See Thomas v. Bailey,* 595 P.2d 1 (Alaska 1979) (land); *Pullen v. Ulmer,* 923 P.2d 54, 63 (Alaska 1996) (wild salmon). These holdings dispense with AAC's argument that the constitutional convention's initial use of the term "appropriation of funds" in a draft version of the provision—later changed to just "appropriation"—carries the meaning AAC ascribes to it. *See also Thomas,* 595 P.2d at 6–7 ("Even if the initiative provision referred to appropriations 'of public funds,' the issue would still be whether public funds refers generically to the state's assets or only those assets in the form of money.").

22. For example, reviewing a municipal initiative in *City of Fairbanks,* we relied on the definition of appropriation set out in *Thomas,* a state-level initiative case. *City of Fairbanks,* 818 P.2d at 1156, *citing Thomas,* 595 P.2d at 7.

23. *Pullen,* 923 P.2d at 63.

24. *Id.; see also City of Fairbanks v. Fairbanks Convention and Visitors Bureau,* 818 P.2d 1153, 1157 (Alaska 1991) (holding that initiative is not an appropriation where there is no "indication that ... the voters would be voting themselves money").

*v. Bailey,*[25] the transfer of Municipal Light & Power to a private cooperative in *Alaska Conservative Political Action Committee v. Municipality of Anchorage,*[26] or the realignment of fishery priorities in *Pullen v. Ulmer.*[27] Neither party suggests that the Girdwood initiative is a give-away.

Second, the limitation on initiatives "preserve[s] to the legislature the power to make decisions concerning the allocation of state assets."[28] This "ensure[s] that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs."[29] This concern is implicated in cases in which the initiative "designate[s] the use of state assets,"[30] even if the assets remain in state ownership. The primary case demonstrating this aspect of the rule against appropriation by initiative is *McAlpine v. University of Alaska.*[31] The initiative in that case proposed the creation of a community college system separate from the University of Alaska. It would have given the university two mandates: first, it required the university to give the community college system "such ... property as is necessary" for its operation.[32] Second, it required that "[t]he amount of property transferred shall be commensurate" with property held by the former community college system on a certain date.[33] The court held that the first requirement was not an appropriation because the university retained discretion to decide both the identity and the amount of property to give the community college system.[34] But the second, which set a specific amount of property to be transferred, was held to be an impermissible appropriation because it would leave the university with only the discretion to "designate the precise articles or parcels to be transferred."[35]

The Girdwood initiative cannot be distinguished from the impermissible section of the initiative in *McAlpine.* In both cases, the initiatives "designate the use of"[36] specified amounts of public assets in a way that encroaches on the legislative branch's exclusive "control over the allocation of state assets among competing needs."[37]

AAC attempts to distinguish *McAlpine* by noting that the initiative there would transfer the property irrevocably from one state agency, the university, to another—the university could do nothing to get it back. AAC maintains that the Girdwood property, by contrast, could not be transferred and could still be managed by the Anchorage Assembly. Although the initiative's amendment of the Anchorage Municipal Charter would preclude the Assembly itself from altering the land's status as a dedicated park, AAC notes that voters could revoke the dedication by a later initiative.[38] But *McAlpine* did not rest its ruling on the fact that the initiative at issue there would have required a formal land transfer; the ruling focused on the fact that the initiative directed a specific amount of property to be used for a specified purpose.

Moreover, our cases establish that the prohibition against appropriating land by initiative in this manner is meant to "ret[ain] ... control of the appropriation process *in the legislative body.*"[39] Here, by limiting the

---

25. 595 P.2d 1 (Alaska 1979).

26. 745 P.2d 936 (Alaska 1987).

27. 923 P.2d 54 (Alaska 1996).

28. *Id.* at 63.

29. *Id.* at 62.

30. *McAlpine v. University of Alaska,* 762 P.2d 81, 89 (Alaska 1988).

31. *Id.*

32. *Id.* at 87–88.

33. *Id.*

34. *Id.* at 91.

35. *Id.*

36. *Id.* at 89.

37. *Pullen,* 923 P.2d at 63.

38. *See* Anchorage Municipal Charter, § 18.01 (requiring voter approval for charter amendments).

39. *City of Fairbanks,* 818 P.2d at 1156 (emphasis added); *see also Pullen,* 923 P.2d at 62 ("The reason for prohibiting appropriations by initia-

mechanism for future change to another initiative process, the initiative's dedication requirement necessarily intrudes on the legislature's control over future designation. The Girdwood initiative's designation of a specific parcel of land as parkland cannot be distinguished from the designation in *McAlpine.* It intrudes on decisions reserved by statute and constitution to the assembly by making an appropriation. The Anchorage clerk was therefore correct to refuse to place the initiative on the ballot.

### D. No Section of the Initiative May Be Certified.

■ The Anchorage clerk denied certification of the entire ballot measure, and the superior court affirmed. AAC argues that even if part of the initiative violates the prohibition on appropriations, that section should be severed and the rest of the measure should be allowed on the ballot. We exercise our power to sever an impermissible section of an initiative "circumspectly"[40] and only when the following conditions are met: "(1) standing alone, the remainder of the proposed bill can be given legal effect; (2) deleting the impermissible portion would not substantially change the spirit of the measure; and (3) it is evident from the content of the measure and the circumstances surrounding its proposal that the sponsors and subscribers would prefer the measure to stand as altered, rather than to be invalidated in its entirety."[41] AAC identifies four aspects of the initiative that would not be eliminated by our decision that designating the tract as parkland is an appropriation: (1) the policy statement about the interests of the voters in having a park; (2) the severability clause; (3) the requirement that the Municipality receive fair market value if it sells land "designated for commercial or residential use" in the initiative; and (4) the prohibition on using the land as a golf course.

■ The policy statement can be given no legal effect, and the severability clause only has any force if other sections of the initiative are saved. The sponsors of the initiative wanted a golf-free park in the lower Girdwood valley, but with the park designation severed, the measure would eliminate any golf use while leaving open the full range of options for other development of the land. The assembly may dispose of the land and designate it for any number of uses. The measure's supporters have expressed a preference for a golf-free park over the land's current status. But in view of many of the possibilities—high-density residential or commercial development, for example—we cannot assume that golf would never be the initiative sponsors' preference when weighed against the other development options. We cannot allow the golf prohibition to go before the voters without the park designation.

■ The fair market value clause by its own terms applies only to the sixty-one acres designated by the initiative as open to residential and commercial development. The initiative states: "All land designated for commercial or residential use in this Section 22.03 may be sold or leased only for its fair market value...." Proposed section 22.03 allows the municipality to select sixty-one acres "for development for single-family dwellings and commercial development." To apply the fair market value requirement to the whole 730 acres addressed by the initiative, we would have to overstep our narrow power of severance by substantially rewriting the measure. Reduced to prescribing the procedure for selling or leasing just sixty-one acres, the initiative bears little resemblance to the original proposal and should not appear on the ballot.[42] Without any of the substantive sections of the initiative, the policy statement and severability clause have no legal effect and cannot go before the electorate.

tive is to ensure that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs."); *McAlpine,* 762 P.2d at 88–89.

40. *Id.* at 93.

41. *Id.* at 94–95.

42. *See McAlpine,* 762 P.2d at 95 n. 26 ("Where nearly all of an initiative is invalid, other courts have refused to put the remainder on the ballot regardless of the intent of the sponsors."); *Fossella v. Dinkins,* 66 N.Y.2d 162, 495 N.Y.S.2d 352, 485 N.E.2d 1017, 1019 (1985) (refusing to allow initiative to go forward "in a redacted and possibly confusing form").

## IV. CONCLUSION

The Anchorage municipal clerk was acting within her authority when she rejected the Girdwood initiative on the ground that it proposed to make an appropriation. Furthermore, her determination was correct—by designating a particular tract of land as a park, the initiative would commit specific public assets to a specific purpose, making an appropriation, an action that may not be taken by initiative. Without the impermissible park designation, the rest of the initiative may not go to the voters. The judgment of the superior court is therefore AFFIRMED.

MATTHEWS and EASTAUGH, Justices, not participating.