**PLANNED PARENTHOOD OF ALASKA and Susan Wingrove, Appellants/Cross–Appellees,**

v.

**Craig CAMPBELL, in his capacity as Lieutenant Governor of the State of Alaska, Loren Leman, Kim Hummer–Minnery and Mia Costello, Appellees/Cross–Appellants.**

Nos. S–13826, S–13835, S–13845.

Supreme Court of Alaska.

June 2, 2010.

Before: FABE, WINFREE, and STOWERS, Justices.

### Order

**IT IS ORDERED:**

1. This expedited appeal concerns the question whether deficiencies in an initiative petition summary can ever be cured for a ballot summary without requiring the sponsors to recirculate petitions and gather new signatures. Although this case involves a challenge to the lieutenant governor's petition summary for an initiative proposing a parental notification requirement for abortions performed on minors, the question it presents applies to all statewide initiatives whether they relate to abortion notification, mining, hunting, fishing, drug use, or any other proper subject.

2. In 2007 we struck down the Parental Consent Act (PCA),[1] which prohibited a doctor from performing an abortion on an unmarried, unemancipated woman younger than seventeen years old without parental consent or judicial authorization.[2] We held that the statute violated a minor's constitutional right to privacy under the Alaska Constitution.[3] However, "we determine[d] that the constitution permits a statutory scheme which ensures that parents are notified so that they can be engaged in their daughters' important decisions in these matters."[4]

3. On May 6, 2009, Loren Leman, Kim Hummer–Minnery, and Mia Costello (sponsors) submitted an application for an initiative entitled "The Parental Involvement Initiative: An Act relating to parental involvement for a minor's abortion" (PNI) to then-Lieutenant Governor Sean Parnell. The PNI would prohibit, in most cases, a doctor from performing an abortion on an unmarried, unemancipated woman younger than eighteen years old without providing notice to—or, alternatively, obtaining consent from—a parent. The PNI is structured as a proposed amendment to the PCA, rather than a stand-alone law.

4. On July 2, 2009, the lieutenant governor certified the sponsors' application, determining that the proposed bill was in the required form, that the application was substantially in the required form, and that there were a sufficient number of qualified sponsors. The lieutenant governor adopted a summary the attorney general had proposed after reviewing the PNI,[5] and the Division of Elections prepared petition booklets to be circulated for signature-gathering.

5. On July 31, 2009, Planned Parenthood of Alaska and Susan Wingrove (Planned Par-

---

1. AS 18.16.010–.020.

2. *State v. Planned Parenthood of Alaska (Planned Parenthood II)*, 171 P.3d 577 (Alaska 2007). We have previously held that a minor's constitutional right to privacy is implicated by a statute restricting her ability to receive an abortion, and that the state may "constrain a minor's privacy right only when necessary to further a compelling state interest and only if no less restrictive means exist to advance that interest." *State v. Planned Parenthood of Alaska (Planned Parenthood I)*, 35 P.3d 30, 41 (Alaska 2001) (citing *Valley Hosp. Ass'n v. Mat–Su Coal. for Choice*, 948 P.2d 963, 969 (Alaska 1997)).

3. *Planned Parenthood II*, 171 P.3d at 583–85.

4. *Id.* at 579.

5. The summary read:
   **Abortion for minor requires notice to or consent from parent or guardian or judicial bypass**
   This bill would require notice to the parent or guardian of a female under the age of 18 before she has an abortion. Notice must be received at least 48 hours before the procedure. This waiting period would be waived if a parent or guardian gives consent.
   The bill also allows the minor to go to court to authorize an abortion without giving notice to her parent or guardian. The minor could ask the court to excuse her from school to attend the hearings and to have the abortion. The court could direct the school not to tell the minor's parent or guardian of the minor's pregnancy, abortion, or absence from school. The bill allows a minor who is a victim of abuse by her parent or guardian to get an abortion without notice or consent. To do this, the minor and an adult relative or authorized official with personal knowledge of the abuse must sign a notarized statement about the abuse.
   The bill sets out a doctor's defense for performing an abortion without first providing notice or obtaining consent where the minor faces an immediate threat of death or permanent physical harm from continuing the pregnancy. Doctors who perform abortions on a minor would have to submit reports.
   Should this initiative become law?

enthood) filed suit in the superior court against Craig Campbell, who had become lieutenant governor, requesting declaratory and injunctive relief. Planned Parenthood's complaint alleged that the lieutenant governor had violated Alaska law, both statutory and constitutional, by certifying the application and by adopting a defective summary. On August 14, 2009, Planned Parenthood filed a motion for a preliminary injunction, which the superior court, by stipulation of the parties, converted into a motion for summary judgment. Planned Parenthood argued that: (1) the lieutenant governor should not have certified the application because it impermissibly prescribed court rules; (2) the PNI itself was incomprehensible and would mislead voters; and (3) the lieutenant governor's summary was not accurate and impartial as required by Alaska law. In September the sponsors intervened as a party in the lawsuit. Both the lieutenant governor and the sponsors filed oppositions to Planned Parenthood's summary judgment motion and cross-motions for summary judgment on September 29, 2009. The superior court heard oral argument on all the summary judgment motions on February 24, 2010.

6. On March 12, 2010, after the sponsors had submitted the petition with more than the requisite 32,734 signatures, the lieutenant governor determined that the petition was properly filed, contained the requisite signatures, and should therefore appear on the ballot. The lieutenant governor intended to employ the same summary for the ballot that he had used for the petition.

7. On March 16, 2010, the superior court issued its order on the summary judgment motions. It granted summary judgment in part to Planned Parenthood and in part to the lieutenant governor and sponsors, concluding:

that the PNI's validation of the PCA is not clearly unconstitutional; that the PNI is understandable by voters; that the PNI unconstitutionally prescribes a limited number of court rules; that the court can sever the offending court prescriptions

from the rest of the PNI; and that the summary of the PNI certified by the lieutenant governor is not impartial and accurate but that the summary can be corrected by the lieutenant governor for the ballot and the election pamphlet.

The superior court enjoined the use of the petition summary, identifying three facts the omission of which rendered the summary not impartial and accurate:

1. The PNI would restrict current law, which does not require parental notification before a minor obtains an abortion.

2. The PNI modifies and revalidates the PCA, a prior legislative enactment that the Alaska Supreme Court found to be unconstitutional because it did not provide the least restrictive means available to impact the minor's fundamental right to privacy. The PNI modifies the PCA by providing for parental notification, the least restrictive means available that meets the state's compelling interest in protecting the health of the minor and in fostering family involvement in a minor's decision regarding her pregnancy.

3. If adopted, the PNI would implicate other laws that make it a criminal offense (a felony with imprisonment for up to five years) for a physician to knowingly violate the statutory notification provisions for giving the minor's parents notice of the minor's intent to have an abortion.

The court ruled that if these facts were set out in a revised ballot summary,[6] the initiative could be placed on a ballot at the next scheduled election. The court entered final judgment on March 31.

8. All three parties appeal the superior court's order. Planned Parenthood appeals the superior court's conclusion that the summary can be corrected for the ballot without recirculating a petition with a revised summary for new signatures. The lieutenant governor and the sponsors cross-appeal the superior court's conclusion that the summary was not impartial and accurate given the

6. The lieutenant governor prepared a revised summary including the omitted information fol-

lowing the superior court's order.

three omissions. We heard oral argument on May 20, 2010.

■ 9. In general, we review "the grant of a summary judgment motion de novo, affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law."[7] We review the superior court's determination regarding the legal sufficiency of a petition or ballot summary de novo.[8] But we give deference to the lieutenant governor's summary itself; "[i]n reviewing the adequacy of a lieutenant governor's ballot summary we apply a 'deferential standard of review.' "[9] The same deferential standard applies to our review of a lieutenant governor's petition summary.[10] "[W]e will not invalidate the summary simply because we believe a better one could be written; instead, 'the lieutenant governor's summary [will] be upheld unless we [cannot] reasonably conclude that the summary [is] impartial and accurate.' "[11] "In matters of initiative and referendum ... the people are exercising a power reserved to them by the constitution and the laws of the state, and ... the constitutional and statuto-ry provisions under which they proceed should be liberally construed."[12] "[A]ll doubts as to all technical deficiencies or failure to comply with the exact letter of procedure will be resolved in favor of the accomplishment of that purpose."[13] In other words, we "preserve [initiatives] whenever possible."[14] "Those attacking the summary bear the burden 'to demonstrate that it is biased or misleading.' "[15] Whether a deficient summary can be "cured" by correcting it for the ballot, but not recirculating the petition, is a question of law.[16] We apply our "independent judgment to questions of law, adopting 'the rule of law most persuasive in light of precedent, reason, and policy.' "[17]

■ 10. Although we hold petition summaries and ballot summaries to the same standards for accuracy and impartiality,[18] there are important differences between the functions served by initiative petition summaries and ballot summaries. "The signature-gathering requirement ... serves an important screening purpose"[19]; it "ensures that only propositions with significant public support are included on the ballot."[20] The

7. *Beegan v. State, Dep't of Transp. & Pub. Facilities,* 195 P.3d 134, 138 (Alaska 2008) (citing *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n,* 152 P.3d 460, 465 (Alaska 2007)).

8. *See Citizens for Implementing Med. Marijuana v. Municipality of Anchorage,* 129 P.3d 898, 901 (Alaska 2006) ("We review de novo the superior court's determination that the petition was legally insufficient.").

9. *Alaskans for Efficient Gov't, Inc. v. State,* 52 P.3d 732, 735 (Alaska 2002) (quoting *Burgess v. Alaska Lieutenant Governor,* 654 P.2d 273, 276 (Alaska 1982)).

10. *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell,* 215 P.3d 1064, 1082 (Alaska 2009) (citing *id.*). We have recognized that in practice the lieutenant governor employs the same summary for both the petition and ballot and noted that the standards for the adequacy of a summary are the same regardless of whether it is a petition or ballot summary. *Id.* at 1082 n. 80.

11. *Alaskans for Efficient Gov't,* 52 P.3d at 735 (quoting *Faipeas v. Municipality of Anchorage,* 860 P.2d 1214, 1217 (Alaska 1993)) (some alteration in original).

12. *Yute Air Alaska, Inc. v. McAlpine,* 698 P.2d 1173, 1181 (Alaska 1985) (quoting *Boucher v. Engstrom,* 528 P.2d 456, 462 (Alaska 1974)); *see* also *Citizens Coal. for Tort Reform, Inc. v. McAlpine,* 810 P.2d 162, 168 (Alaska 1991).

13. *Yute Air Alaska,* 698 P.2d at 1181 (quoting *Boucher,* 528 P.2d at 462).

14. *See Pullen v. Ulmer,* 923 P.2d 54, 58 (Alaska 1996) (quoting *Fairbanks v. Convention & Visitors Bureau,* 818 P.2d 1153, 1155 (Alaska 1991)).

15. *Pebble Ltd. P'ship,* 215 P.3d at 1083 (quoting *Burgess,* 654 P.2d at 276).

16. *Cf. Alaska Action Ctr., Inc. v. Municipality of Anchorage,* 84 P.3d 989, 991 (Alaska 2004) (stating that whether an impermissible provision of an initiative can be severed, allowing the initiative to appear on the ballot without recirculating the petition for new signatures, is a question of law).

17. *Jacob v. State, Dep't of Health & Soc. Servs.,* 177 P.3d 1181, 1184 (Alaska 2008) (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

18. *Pebble Ltd. P'ship,* 215 P.3d at 1082 n. 80.

19. *Faipeas,* 860 P.2d at 1219.

20. *Citizens for Implementing Med. Marijuana,* 129 P.3d at 901 (citing *id.*).

requirement that signatures be gathered on a petition with an accurate and impartial summary prevents the state and the opponents of an initiative from "spend[ing] the large sums of money required when a proposed bill is put on the ballot if there is not sufficient public support for the initiative."[21] "[T]he basic purpose of the ballot summary," on the other hand, "is to enable voters to reach informed and intelligent decisions on how to cast their ballots—decisions free from any partisan suasion."[22]

■ 11. We have noted that omissions, as well as commissions, can render a petition or ballot summary legally deficient.[23] " 'The summary need not recite every detail of the proposed measure,' but 'if the information would give the elector serious grounds for reflection it is not a mere detail, and it must be disclosed.' "[24]

■ 12. In the present case, we are persuaded that the superior court correctly concluded that the three omissions it identified render the lieutenant governor's petition summary inaccurate in the sense that the information, were it to be included in the summary, would give petition signers "serious grounds for reflection." We are particularly concerned about the summary's omission of the fact that the PNI would make a physician's violation of its terms a felony[25] punishable by up to five years in prison.[26] Both the lieutenant governor and the sponsors argue that the summary gives sufficient

notice that a doctor who violates the PNI would face legal consequences because the summary mentions a doctor's legal defense under the PNI. But the type and severity of legal consequences a doctor might face could reasonably give a voter "serious grounds for reflection."[27] The lieutenant governor also argues that the punishment is not a main feature of the proposed law because the PNI concerns primarily parents and children; "the doctor's role ... is secondary," he argues. We are unpersuaded by this argument. The PNI's primary enforcement mechanism is the punishment a doctor would face,[28] and in that sense it is a main feature of the initiative. The omissions the superior court identified (particularly the first and third omitted facts) are main features of the PNI and should have been disclosed in the petition summary, as the superior court correctly concluded. As we have held, the fact that the summary is deficient for the purposes of the petition means it would also be deficient for the purposes of the ballot.[29]

■ 13. We conclude that for any initiative that regulates conduct and creates criminal penalties for a violation of its code of conduct, the petition and ballot summaries must, as a matter of law, describe both the regulated conduct and the penalties.

■ 14. The question in this case is whether a deficient petition summary can ever be corrected for the ballot without recir-

---

21. *Faipeas,* 860 P.2d at 1219–20 (quoting Cynthia L. Fountaine, Note, *Lousy Lawmaking: Questioning the Desirability and Constitutionality of Legislating by Initiative,* 61 S. CAL. L.REV. 733, 746 (1988)).

22. *Alaskans for Efficient Gov't,* 52 P.3d at 735.

23. *Burgess,* 654 P.2d at 275 (stating that a summary "ought to be free from any misleading tendency, whether of amplification, of omission, or of fallacy" (quoting *Hope v. Hall,* 229 Ark. 407, 316 S.W.2d 199, 201 (1958))).

24. *Pebble Ltd. P'ship,* 215 P.3d at 1082 (quoting *Alaskans for Efficient Gov't,* 52 P.3d at 736).

25. The sponsors erroneously suggest that the superior court improperly classified the violation of the initiative as a felony because a violation of the PNI would not necessarily be punished by more than a year in prison. Alaska Statute

11.81.900(b)(24) defines a felony, however, as "a crime for which a sentence of imprisonment for a term of more than one year is *authorized,*" rather than actually imposed. (Emphasis added.) *See also* BLACK'S LAW DICTIONARY 651 (8th ed. 2004) (defining a felony as a serious crime usually *"punishable* by imprisonment for more than one year" (emphasis added)).

26. AS 18.16.010(c).

27. *See Pebble Ltd. P'ship,* 215 P.3d at 1082 (quoting *Alaskans for Efficient Gov't,* 52 P.3d at 736).

28. *See* AS 18.16.010(c). Because the PNI would modify and revalidate AS 18.16.010(a)(3), it would also reinvigorate AS 18.16.010(e), subjecting a doctor who violated the PNI to civil liability.

29. *See Pebble Ltd. P'ship,* 215 P.3d at 1082 n. 80.

culating the petition for new signatures. This issue requires consideration of competing interests and principles: the people's right to enact legislation by initiative is in tension with the procedural safeguards ensuring that the initiative power be exercised in an informed manner, and that only initiatives with sufficient support appear on the ballot. On one hand, the Alaska Constitution gives to the people of Alaska the right to "propose and enact laws by the initiative." [30] We have stated that "[i]n matters of initiative and referendum ... the people are exercising a power reserved to them by the constitution and the laws of the state, and ... the constitutional and statutory provisions under which they proceed should be liberally construed." [31] As such, we "preserve [initiatives] whenever possible." [32] On the other hand, the Alaska Constitution limits the people's right to enact legislation by initiative. First, some subjects are simply off-limits to the initiative process. [33] Second, serving as a screening function, an initiative must be presented to the public for a demonstration of sufficient support to allow it to go to the voters on the ballot. [34] The legislature has

clarified that the presentation to the public must be impartial. [35] As we have said, "[t]he public interest in informed lawmaking requires that referendum and initiative petitions meet minimum standards of accuracy and fairness. '[O]ur main concern should be that ... initiative petitions ... should be presented *clearly* and honestly to the people of Alaska.'" [36] To further this goal, an initiative summary must be "a fair, concise, true and impartial statement of the intent of the proposed measure," [37] "free from any misleading tendency, whether of amplification, of omission, or of fallacy, and ... must contain no partisan coloring." [38] The lieutenant governor and sponsors emphasize the importance of the people's right to enact laws by initiative; Planned Parenthood emphasizes the importance of the procedures designed to ensure petition-signers are informed and only initiatives with sufficient support reach the ballot. We must consider the people's fundamental interests in exercising their constitutional right to initiate legislation [39] and in safeguards ensuring informed lawmaking. [40]

**30.** Alaska Const. art. XI, § 1; *see also* AS 15.45.010.

**31.** *Yute Air Alaska,* 698 P.2d at 1181 (quoting *Municipality of Anchorage v. Frohne,* 568 P.2d 3, 8 (Alaska 1977)).

**32.** *See Pullen,* 923 P.2d at 58 (quoting *Convention & Visitors Bureau,* 818 P.2d at 1155).

**33.** Alaska Const. art. XI, § 7 ("The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, or enact local or special legislation."); *see also* AS 15.45.010.

**34.** *See* Alaska Const. art. XI, § 3; *see also Citizens for Implementing Med. Marijuana v. Municipality of Anchorage,* 129 P.3d 898, 901 (Alaska 2006) ("The signature-gathering requirement ensures that only propositions with significant public support are included on the ballot.") (citation omitted); *cf. Faipeas v. Municipality of Anchorage,* 860 P.2d 1214, 1219 (Alaska 1993) (stating, with respect to a referendum, that "[a] substantial showing of popular disapproval is required").

It is noteworthy that the Alaska Constitution was amended not that long ago to make the screening process more stringent—the demonstration of public support for an initiative now must include petition signatures by qualified voters who, in each of at least three-fourths of the

State's house districts, "are equal in number to at least seven percent of those who voted in the preceding general election in" that district. SLA 2004, L.R. 48 (approved Nov. 2, 2004 and effective Jan. 2, 2005) (amending Alaska Const. art. XI, § 3).

**35.** AS 15.45.090(a)(2).

**36.** *Faipeas,* 860 P.2d at 1221 (quoting *Yute Air Alaska,* 698 P.2d at 1188 (Moore, J., dissenting)) (emphasis in original).

**37.** *Burgess,* 654 P.2d at 275 (quoting *In re Second Initiated Constitutional Amendment Respecting the Rights of the Pub. to Uninterrupted Serv. by Pub. Employees of 1980,* 200 Colo. 141, 613 P.2d 867, 869 (1980)).

**38.** *Id.* (quoting *Hope v. Hall,* 229 Ark. 407, 316 S.W.2d 199, 201 (1958)).

**39.** *See Citizens Coal. for Tort Reform,* 810 P.2d at 168 ("[T]he people's broad constitutional right to legislate by initiative 'should be liberally construed to permit exercise of that right.'" (quoting *Thomas v. Bailey,* 595 P.2d 1, 3 & n. 13 (Alaska 1979))).

**40.** *See Faipeas,* 860 P.2d at 1220 ("[P]etitions ... are formal documents which are part of the

15. We stated in *Faipeas v. Municipality of Anchorage* that requiring petition summaries for initiatives to be clear and honest "is necessary '[t]o guard against inadvertence by petition-signers and voters and to discourage stealth by initiative drafters and promoters.'"[41] Because the PNI is a statewide initiative and the lieutenant governor, not the sponsors, prepared the petition summary for the PNI,[42] we are not here presented with a case concerning sponsor or promoter stealth.[43] Of the two factors we discussed in *Faipeas*, only guarding against petition-signer inadvertence is an appreciable concern in the present case. We must therefore attempt to determine the likelihood that, and the degree to which, the PNI's deficient petition summary contributed to petition-signer inadvertence.

16. While we have developed a growing body of case law on initiatives, we have never had occasion to examine an initiative in precisely this procedural posture. The petition summary in this case was misleading by omission, rather than commission. Furthermore, this case involves a petition for a statewide initiative, not a petition for a municipal initiative like those involved in *Faipeas*[44] and *Citizens for Implementing Medical Marijuana v. Municipality of Anchorage.*[45] As such, it is significant that it was the lieutenant governor, acting in accordance with his lawful mandate, who prepared the petition summary.[46] As far as the record reveals, the initiative sponsors had no role in preparing the petition summary and depended entirely on the lieutenant governor to prepare a valid summary in order to advance their initiative to the ballot.

17. Though we have not had occasion to address a case in precisely this procedural posture, we have previously considered a case where the people were permitted to vote on a ballot initiative whose content was modified by the court after concluding that the initiative as originally proposed at the petition stage was legally impermissible. In *McAlpine v. University of Alaska*, we severed an impermissible appropriation provision from an initiative to establish a separate community college system within state government, allowing the altered initiative to go on the ballot.[47] Planned Parenthood argues that severance cases are distinguishable

---

lawmaking process. They should be a source of accurate information for all citizens concerning what is proposed.").

**41.** *Faipeas*, 860 P.2d at 1221 (quoting *Yute Air Alaska*, 698 P.2d at 1189 (Moore, J., dissenting)) (alteration in original).

**42.** AS 15.45.090; Alaska Const. art. XI, § 3. *See also Faipeas*, 860 P.2d at 1218–19 (noting that for statewide initiatives, "the lieutenant governor prepares a petition which must contain 'a summary of the subject matter'" whereas for municipal initiatives in Anchorage, like the one at issue in that case, proponents "are not required to file an application for a petition with the municipality, nor does a city official prepare the petition").

**43.** The dissent suggests we are abandoning *Faipeas*. We disagree. This decision does not abandon the *Burgess* standard for determining whether an initiative summary is accurate and impartial as applied in *Faipeas*. Nor does this opinion abandon in all cases the remedy articulated in *Faipeas* requiring initiative sponsors to recirculate their petition for new signatures. Instead, this decision addresses a question we have never previously addressed—whether the remedy articulated in *Faipeas* must *always* be applied when the lieutenant governor, rather than initiative sponsors and promoters, drafted the defective initiative summary.

**44.** *Faipeas*, 860 P.2d at 1215.

**45.** *Citizens for Implementing Med. Marijuana*, 129 P.3d at 898.

**46.** AS 15.45.090(a) ("If the application is certified, the lieutenant governor shall prepare a sufficient number of sequentially numbered petitions to allow full circulation throughout the state. Each petition must contain . . . an impartial summary of the subject matter of the bill. . . ."); Alaska Const. art. XI, § 3 ("After certification of the application, a petition containing a summary of the subject matter shall be prepared by the lieutenant governor for circulation by the sponsors."); *see also Faipeas*, 860 P.2d at 1218–19 (noting that "[i]n contrast" to municipal initiatives, for statewide initiatives, "the lieutenant governor prepares a petition which must contain 'a summary of the subject matter.'"); *Alaskans for Efficient Gov't*, 52 P.3d at 737 (Eastaugh, J., dissenting) ("The responsibility for developing [summary] language is vested by constitution and statute in the lieutenant governor." (internal citations omitted)).

**47.** *McAlpine v. Univ. of Alaska*, 762 P.2d 81, 96 (Alaska 1988).

from, and not particularly useful in analyzing, cases involving deficient summaries. Although there are undoubtedly differences between cases like the present case, in which a petition is circulated with a legally deficient summary, and cases in which a petition is circulated for an initiative containing an impermissible provision,[48] we think there are important similarities that make our severance cases instructive in the present context. In both types of cases signatures are gathered on petitions that do not precisely reflect the final initiative on which the voters will ultimately vote. And in both types of cases we must determine whether those signatures nevertheless satisfy constitutional and statutory requirements, in other words, whether the petition has "serve[d] [its] important screening purpose," [49] allowing the initiative to go on the ballot without recirculating petitions.

18. In the severance context we have noted:

> [W]hen the requisite number of voters have already subscribed to an initiative, a reviewing court should sever an impermissible portion of the proposed bill when the following conditions are met: (1) standing alone, the remainder of the proposed bill can be given legal effect; (2) deleting the impermissible portion would not substantially change the spirit of the measure; and (3) it is evident from the content of the measure and the circumstances surrounding its proposal that the sponsors and subscribers would prefer the measure to stand as altered, rather than to be invalidated in its entirety.[50]

We have cautioned that "[w]e exercise our power to sever an impermissible section of an initiative 'circumspectly.' " [51] Only the second and third factors are readily adaptable to the deficient petition summary context. The second factor would ask whether omitting the required information from the petition summary substantially changed—or misrepresented—the spirit of the measure. The third factor would ask whether it is evident from the content of the measure and the circumstances surrounding its proposal that the subscribers, fully understanding the proposal (as if they had been presented a proper summary), would prefer the measure to stand (in other words, go on the ballot), rather than to be invalidated in its entirety. This formulation instructs us to look to the content of the measure and the circumstances surrounding its proposal (the degree to which the summary was defective, for example) in discerning the likelihood and extent of petition-signer inadvertence.

19. Our severance cases also instruct us to look to the hardship that invalidating petition signatures would cause to an initiative's sponsors. In *McAlpine* we noted that invalidating signatures "forces the sponsors to choose between abandoning their efforts altogether and submitting a new application and expending, for the second time, the significant time and effort required to generate public enthusiasm and gather the requisite number of signatures." [52] This hardship must be balanced against the danger that initiative opponents will be required to respond to an initiative for which there is insufficient public support:

> The signature gathering requirement is important because it eliminates the initiation of an expensive campaign process when there is insufficient public support for an initiative. Neither the state nor the opponents of a proposed bill should be required to spend the large sums of money required when a proposed bill is put on the ballot if there is not sufficient public support for the initiative.[53]

48. *E.g., id.; Alaska Action Ctr.,* 84 P.3d at 995.

49. *Faipeas,* 860 P.2d at 1219.

50. *McAlpine,* 762 P.2d at 94–95; *see also Alaska Action Ctr.,* 84 P.3d at 995 (applying the three severability factors).

51. *Alaska Action Ctr.,* 84 P.3d at 995; *see also McAlpine,* 762 P.2d at 93.

52. *McAlpine,* 762 P.2d at 93.

53. *See Faipeas,* 860 P.2d at 1219–20 (quoting Cynthia L. Fountaine, Note, *Lousy Lawmaking: Questioning the Desirability and Constitutionality of Legislating by Initiative,* 61 S. Cal L.Rev. 733, 746 (1988)).

20. We conclude that a court, when faced with statewide initiative petitions [54] that have been circulated with a defective summary, must consider the nature and magnitude of the misleading statement or omission, the likelihood and extent of petition-signer inadvertence,[55] the hardship to initiative sponsors that invalidating signatures would cause,[56] and the hardship to the initiative's opponents that permitting the initiative to go forward would cause.[57]

21. Although the petition summary in this case was deficient and misleading by omission, it was not as misleading as the petitions in *Faipeas*[58] and *Citizens for Implementing Medical Marijuana*,[59] and petition-signer inadvertence was unlikely or minimal in this case. The petition summary's omissions did not substantially misrepresent the essential nature of the PNI.[60] Furthermore, like the initiative's sponsors in *McAlpine*, the sponsors here have already expended a significant amount of time and resources to gather all of the required signatures, so the hardship to them would be great were we to invalidate the signatures. Finally, we discern little hardship to the initiative opponents if the corrected summary is allowed to be used as the ballot summary. We agree with the superior court and conclude that the lieutenant governor may place the PNI on the ballot without requiring the sponsors to recirculate the petition.

22. Provided that the summary is corrected and provided that the PCA [61] *and* the enforcement provisions implicated by the PNI [62] are made available to the voters along with the PNI,[63] we conclude that the integrity of the initiative process, along with our adherence to standards that favor the people's right to enact laws by initiative and that favor voters' rights to be informed about proposed initiative measures, will be maintained.

23. We AFFIRM the superior court's order to the extent we have addressed the issues presented in these cross-appeals.[64]

Entered by direction of the court.

CARPENETI, Chief Justice, and CHRISTEN, Justice, not participating.

WINFREE, Justice, concurring in part and dissenting in part.

WINFREE, Justice, concurring in part and dissenting in part.

1. I agree with the majority that the superior court correctly concluded that omis-

---

**54.** We do not decide whether this balancing test will apply to local level municipal or home rule initiatives, where initiative summaries are drafted by the initiative sponsors and the requirement that summaries be clear and honest therefore serves the additional purpose of "discourag[ing] stealth by initiative drafters and promoters." *See supra* ¶ 15 & n. 43; *Faipeas*, 860 P.2d at 1221.

**55.** *See Faipeas*, 860 P.2d at 1221; *cf. McAlpine*, 762 P.2d at 94–95.

**56.** *See McAlpine*, 762 P.2d at 93.

**57.** *See Faipeas*, 860 P.2d at 1219–20.

**58.** In *Faipeas*, the primary issue was not whether the petition was inaccurate, but whether municipal petitions were required to be fair and accurate at all. *Id.* at 1218.

**59.** In *Citizens for Implementing Medical Marijuana*, we held that a municipal clerk properly refused to certify a petition to legalize medical marijuana because the petition title was confusing; the proposition did not explain whether it created or abolished rights; and even if the petition's sponsors' interpretation of the petition were accepted, the petition was misleading. *Cit-*

*izens for Implementing Med. Marijuana*, 129 P.3d at 902–05. In this case, the petition's language was so confusing and misleading that it was impossible to discern what the subscribers intended to support when they signed the petition, and therefore no remedy could be fashioned at the ballot summary stage. *See id.*

**60.** *See McAlpine*, 762 P.2d at 94–95.

**61.** AS 18.16.010(a)(3), .020.

**62.** AS 18.16.010(c), (e).

**63.** AS 15.45.200 provides that "[t]he director shall provide each election board with at least five copies of the proposed law being initiated, and the election board shall display at least one copy of the proposed law in a conspicuous place in the room where the election is held."

**64.** Some of the superior court's conclusions were not appealed. We did not review, nor do we express an opinion on, the superior court's conclusions regarding the constitutionality of the PNI's revalidation of the PCA, the PNI's understandability, and the PNI's court rules provisions and their severability.

sions in the initiative petition summary rendered it inaccurate.[1] I write further on this point to emphasize that regardless of an initiative's subject matter, if the initiative regulates conduct and creates criminal penalties for a violation of the new code of conduct, the petition summary must, as a matter of law, generally describe both the regulated conduct and the potential penalties for misconduct. Any purported regulation of conduct must include consequences, otherwise it is meaningless; the penalties for criminalized conduct are therefore as main a feature of an initiative as the conduct itself. And in this case the penalty is significant—the proposed law would authorize up to a $1,000 fine, five years imprisonment, or both, which means that the crime created by the initiative is by definition a felony. A petition summary simply cannot be impartial if it describes conduct sought to be regulated, but does not describe the penalties for failure to conform to the new code of conduct.

2. The harder question in this case is what happens when a lieutenant governor certifies an initiative and provides a defective petition summary for circulation to potential signers. In a perfect world any questions about a petition summary would be resolved prior to printing and circulating petition booklets for signatures. Because we do not live in a perfect world, a brief chronology will place events in perspective.

3. The initiative application was submitted in May 2009. On July 2 the Department of Law sent a 17–page review of the application to the lieutenant governor, recommending approval of the application and proposing the petition summary that is in question.[2] That same day the lieutenant governor certi-

fied the initiative, adopted the summary recommended by the Department of Law, and advised the sponsors that they would have one year from the time the petition booklets were printed and made available to them to obtain the necessary signatures to put the initiative on the ballot. It appears that the petition booklets were made available to the sponsors on July 13.

Alaska Statute 15.45.240 allows an aggrieved party to bring suit within 30 days of a lieutenant governor's certification of an initiative, and Planned Parenthood of Alaska and Susan Wingrove (collectively "Planned Parenthood") did so on July 31. Planned Parenthood raised a number of arguments about the petition summary, including that the summary was defective. Planned Parenthood sought injunctive relief, including orders that the initiative petition not be circulated for signatures and that the initiative not be placed on a ballot.[3]

Planned Parenthood filed its motion for injunctive relief on August 14. On August 27 Planned Parenthood and the lieutenant governor filed a stipulation to convert the motion into one for summary judgment. The superior court approved the stipulation on September 10. The sponsors did not move to become a party until September 15, and the court granted that motion on September 29. At that time, the sponsors apparently had over one-third of the necessary signatures to put the initiative on the ballot. The lieutenant governor and the sponsors filed cross-motions for summary judgment, and, as a result of the parties' scheduling agreements, briefing was finally completed on November 3. At some point thereafter the case was

---

1. Order, ¶¶ 12–13.

2. Nowhere in the Department of Law's comprehensive review and summary of the proposed initiative is there any mention of the fact that the initiative would create felony liability for doctors who violate the proposed law.

3. Two oddities of the current initiative process are revealed at this juncture of the case. First, petition booklets apparently are distributed for circulation before the time has passed for a challenge to the initiative or the petition summary. As a result, the one-year period for collecting signatures on the petition runs concurrently with

the time necessary to resolve potential challenges to the initiative. Therefore, initiative sponsors are at risk that their efforts to collect signatures will be nullified if a challenge is successful. Second, there is no statutory procedure for expedited consideration of an initiative challenge. As a direct result of these oddities, the final resolution of the initiative challenge in this case comes after the sponsors successfully obtained enough signatures to place the petition on the ballot. This is undesirable, at best, and the legislature may wish to consider appropriate statutory implementation to avoid future problems of this nature.

reassigned to Superior Court Judge Frank A. Pfiffner, and he set oral argument on the summary judgment motions for February 24, 2010. Oral argument was held as scheduled; Judge Pfiffner took the matter under advisement. On March 12 the lieutenant governor certified that the sponsors had submitted sufficient petition signatures to place the initiative on the August 2010 ballot. Judge Pfiffner entered his decision on March 16, and final judgment was entered March 31. Planned Parenthood appealed, and, after an expedited briefing schedule, we heard oral argument on May 20 with the understanding that a decision was required by a date in early June for purposes of printing the August 2010 election booklets and ballots.

4. With this chronology in mind I return to my earlier question, now phrased somewhat differently: what happens when a lieutenant governor certifies an initiative and, *after the sponsors obtain sufficient petition signatures to place the initiative on the ballot,* it is determined that the petition summary used to obtain the petition signatures was defective?

As the majority explains, this question implicates two important but competing policies.[4] It is the Alaska Constitution that gives the people the right to "propose and enact laws by the initiative,"[5] and public policy requires courts to afford that right great protection.[6] But our Constitution also contains a countervailing check and balance.

Serving as a screening function, an initiative must be presented to the public for a demonstration of sufficient support to allow it to go to the voters on the ballot,[7] and the legislature has clarified that the presentation to the public must be impartial.[8] Public policy requires courts to honor this screening function to ensure both informed lawmaking and that only initiatives with sufficient public support are allowed on the ballot.[9]

5. Here the petition was signed by the requisite number of supporters and thus seemingly meets the public support requirement. But the petition contained a summary that failed to meet the disclosure standards necessary for informed lawmaking; the summary was not accurate and impartial. In short, (1) we cannot know for certain that the initiative would have had sufficient support had it been fairly presented to petition signers for "informed lawmaking," and (2) a strict adherence to the screening function would seem to mandate that the initiative not be allowed on the ballot.[10]

6. In *Faipeas v. Municipality of Anchorage* we held that a municipal referendum petition that was not accurate and fair was not "legally acceptable"[11] and, despite enough signatures to demonstrate sufficient public support for the referendum, we stayed the municipal election pending resolution of an appeal of the municipal clerk's certification decision.[12] Today the majority dissects *Faipeas* to create a meaningless distinction

**4.** Order, ¶ 14.

**5.** Alaska Const. art. XI, § 1; *see also* AS 15.45.010.

**6.** Order, ¶ 14 (citing *Yute Air Alaska, Inc. v. McAlpine*, 698 P.2d 1173, 1181 (Alaska 1985) (quoting *Municipality of Anchorage v. Frohne*, 568 P.2d 3, 8 (Alaska 1977))).

**7.** Order, ¶ 14 (citing Alaska Const. art. XI, § 3; *Citizens for Implementing Med. Marijuana v. Municipality of Anchorage*, 129 P.3d 898, 901 (Alaska 2006)) ("The signature-gathering requirement ensures that only propositions with significant public support are included on the ballot.") (citation omitted); and *Faipeas v. Municipality of Anchorage*, 860 P.2d 1214, 1219 (Alaska 1993) (stating, with respect to a referendum, that "[a] substantial showing of popular disapproval is required").

**8.** AS 15.45.090(a)(2).

**9.** *See Citizens for Implementing Med. Marijuana*, 129 P.3d at 901 (stating that " 'initiative petitions . . . should be presented *clearly* and honestly' " in light of "the 'public interest in informed lawmaking' " (quoting *Faipeas*, 860 P.2d at 1221)) (emphasis in original); *Faipeas*, 860 P.2d at 1219–20 (citation omitted) (noting that signature-gathering requirement ensures expense of election is warranted by sufficient public support).

**10.** *See, e.g., Faipeas*, 860 P.2d at 1215–16, 1218 (holding that referendum petitions that are not accurate and fair are not "legally acceptable" and staying election until resolution of appeal of municipal clerk's certification decision).

**11.** *Id.* at 1218.

**12.** *Id.* at 1215–16.

and then concludes that some initiative petition summaries that are not accurate and fair *can* be legally acceptable for purposes of placing initiatives on the ballot.

The majority begins with the statement in *Faipeas* that requiring clear and honest petition summaries "is necessary '[t]o guard against inadvertence by petition-signers and voters and to discourage stealth by initiative drafters and promoters.' "[13] The majority dissects this into separate categories of "inadvertence" and "stealth," determines as a matter of law that a lieutenant governor could never be involved in stealth-like conduct, and concludes, therefore, that because this case involves a statewide initiative with a petition summary authorized by the lieutenant governor, the only issue of concern is "inadvertence by petition-signers."[14]

The majority accepts the argument that we can substitute our own view of "informed lawmaking" and "sufficient public support" for the standards set out in article XI, section 3 of the Alaska Constitution and AS 15.45.090(a)(2) by determining "the likelihood that, and the degree to which, the . . . deficient petition summary contributed to petition-signer inadvertence."[15] The majority further accepts the argument that we should then consider the degree of hardship that invalidating signatures or allowing the initiative to go forward would cause initiative sponsors and opponents, as well as our own determination whether the initiative, if fully and properly explained to potential petition signers, would have had sufficient public support to go on the ballot.[16]

My view of judicial restraint leaves me unable to agree that a court should entertain this new line of inquiry or create a substitute for what has been to date an express constitutional and statutory standard for determining sufficient public support. I therefore dissent with respect to this issue.

First, it is true that here the summary was prepared by a lieutenant governor based on advice from the Department of Law and there is no question of bad faith or an intent to fool petition signers. But a mistake was made, and both the superior court and this court agree that the mistake rendered the petition summary not accurate and impartial. Whether caused by design or mistake or by a lieutenant governor or sponsors, an inaccurate and biased petition summary is capable of fooling petition signers. Does a superior court now have to find not only that a petition summary was misleading, but also that it was intentionally misleading, to bar an initiative from the ballot? And why should any distinction matter? If a court can cure a misleading petition summary by modifying it for ballot purposes, why isn't the inquiry into petition-signer inadvertence and the hardship analysis appropriate in virtually every context of a defective petition summary or defective municipal initiative?

Second, the majority describes a new class of misleading petition summaries—those that are "not . . . misleading" enough to "substantially misrepresent the essential nature" of the initiative and, therefore, in the appropriate case, might not warrant barring the initiative from the ballot.[17] My response is that by definition, the petition summaries in this class are not misleading and no judicial intervention of any kind should even be necessary. I agree with Planned Parenthood on this point—a petition summary either meets our existing standards or it does not, and a petition summary cannot fall below those existing standards but be excused because it falls only a little bit below those standards. Once the court determines a petition summary is misleading, as the superior court did and we have done in this case, the inquiry should end.[18]

---

**13.** Order, ¶ 15 (quoting *Faipeas*, 860 P.2d at 1221 (quoting *Yute Air Alaska*, 698 P.2d at 1189 (Moore, J., dissenting))).

**14.** Order, ¶ 15.

**15.** Order, ¶ 15.

**16.** Order, ¶¶ 15–20.

**17.** Order, ¶ 21.

**18.** Nonetheless, I am compelled to make two comments. First, I find it contradictory that the majority would agree, as a matter of law, that a petition summary for an initiative that criminalizes conduct must include information about the relevant criminal penalties, but still determine that the failure to meet that legal standard is "not . . . misleading" enough to "substantially misrepresent the essential nature" of the initiative. Second, once a judge determines that a

7. The majority's reliance on *McAlpine v. University of Alaska*[19] and *Alaska Action Center, Inc. v. Municipality of Anchorage*[20] is misplaced. In both *McAlpine*, a statewide initiative case, and *Alaska Action Center*, a municipal initiative case, there were no questions about the screening process.[21] Consequently, we did not consider whether the statewide petition summary or the municipal initiative failed the "informed lawmaking" or "sufficient public support" standards set by article XI, section 3 of the Alaska Constitution or AS 15.45.090(a)(2).[22] In both cases the issues were whether, on pre-election review for constitutionality, a portion of the initiative should be severed as violative of the article XI, section 7 prohibition against appropriation by initiative, and, if so, whether the remaining portion should go forward to an election.[23]

After concluding in *McAlpine* that the initiative included an unconstitutional appropriation,[24] we adopted a rule that "when the requisite number of voters have already subscribed to an initiative," a court should sever the impermissible provisions from the initiative and allow it to go forward to an election if

(1) standing alone, the remainder of the proposed bill can be given legal effect; (2) deleting the impermissible portion would not substantially change the spirit of the measure; and (3) it is evident from the content of the measure and the circumstances surrounding its proposal that the

petition summary is "not ... misleading" enough to "substantially misrepresent the essential nature" of the initiative, what countervailing factor in the balancing test described by the majority could possibly lead to a conclusion that the initiative should not go on the election ballot?

19. 762 P.2d 81 (Alaska 1988).

20. 84 P.3d 989 (Alaska 2004).

21. *McAlpine*, 762 P.2d at 84–96; *Alaska Action Ctr.*, 84 P.3d at 991–95.

22. *McAlpine*, 762 P.2d at 84–96; *Alaska Action Ctr.*, 84 P.3d at 991–95.

23. *McAlpine*, 762 P.2d at 87–96; *Alaska Action Ctr.*, 84 P.3d at 995.

24. *McAlpine*, 762 P.2d at 87–91.

sponsors and subscribers would prefer the measure to stand as altered, rather than to be invalidated in its entirety.[25]

Applying that test, we allowed the remaining portion of the initiative to go forward to the election.[26] Later, in *Alaska Action Center*, we determined that a portion of the initiative was unconstitutional, applied the *McAlpine* test, and concluded that the remaining portion of the initiative bore "little resemblance to the original proposal and should not appear on the ballot."[27]

It is true that in this context we consider the subscribing signers' intent in deciding whether to allow an already screened but subsequently limited initiative to go forward to an election. But it is a giant leap from there to establishing a new rule that we will look to the subscribing signers' intent in deciding whether to excuse an initiative from the express constitutional and statutory screening process altogether. In my view the analysis and remedy here far exceed those authorized by our precedent.

8. This may be, as the majority notes, the first time this situation has come before us.[28] But unless the legislature changes the initiative process to require that initiative challenges be resolved before petitions are circulated for signature, it will not be the last. This situation certainly has arisen and will continue to arise in the municipal initiative context;[29] the majority's suggestion that somehow the new framework does not apply to municipal initiatives is not persuasive.[30]

25. *Id.* at 94–95 (footnotes and citations omitted).

26. *Id.* at 95–96.

27. *Alaska Action Ctr.*, 84 P.3d at 993–95 (citing in part *McAlpine*, 762 P.2d at 95 n. 26).

28. Order, ¶ 16.

29. Cf. *Faipeas*, 860 P.2d at 1218–21 (staying election pending resolution of appeal and addressing challenge that referendum petition, which had circulated and collected the required number of signatures, was biased and partisan).

30. The majority sends a mixed message by relying on *Alaska Action Center*, a municipal initiative case, as support for its adoption of new standards for statewide initiative petitions. Order, ¶¶ 9 n. 16, 18 nn. 50–51.

And I can envision other similar scenarios— what will happen when initiative sponsors have almost all of the necessary signatures but are prevented by some force of nature or other circumstances outside their control from obtaining those last few signatures within the requisite time period? Why would they not be entitled to have the court determine the likelihood that the sponsors otherwise would have succeeded and balance that with the hardships, instead of having to start all over again? Once the court has moved from enforcing express constitutional and statutory standards to using them as mere guidelines for ad hoc judgments, there is no telling where on the ensuing slippery slope a line ultimately will be drawn.

9. I readily agree that the result I advocate—requiring that a new petition be circulated for signatures—is harsh. It is evident that the sponsors would have obtained sufficient signatures on the petition within the requisite time period even if a fair and impartial summary had been presented in the petition booklets. It is unquestionably unfair that the sponsors should suffer the consequences of a mistake by the Department of Law. But the facts and circumstances of this particular case do not justify the creation of a new legal framework that will lessen incentives for accurate and impartial petition summaries and will change the constitutionally based screening standard from a bright-line rule to the varying views of judges.

The initiative is an important tool for citizen law making. But no initiative should be presented on an election ballot if it has not met the existing constitutional and statutory screening standards. If an initiative petition summary used to gather signatures is not legally acceptable, the initiative should be barred from the ballot and a new petition circulated with an accurate and impartial summary as the Alaska Constitution and AS 15.45.090(a)(2) require. Because the petition summary in this case was not legally acceptable, I would bar the initiative from the ballot.